[No. S032509. May 8, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIK SANFORD CHATMAN, Defendant and Appellant.

## Counsel

Mark Goldrosen, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CORRIGAN, J.**—A jury convicted Erik Sanford Chatman of first degree murder under the special circumstance of torture murder and with use of a knife.[1] The jury acquitted him of robbery and rejected a related robbery-murder special-circumstance allegation.[2] It did find defendant guilty of the lesser offense of grand theft. After the jury returned a death verdict, the court denied defendant's motion to modify the verdict[3] and imposed sentence. In this automatic appeal, we affirm the judgment.[4]

### I. FACTS

#### A. *Guilt Phase*

##### 1. *Overview*

On October 7, 1987, defendant stabbed Rosellina Lo Bue to death at a Photo Drive Up store in San Jose. He stabbed Lo Bue 51 times and took cash from the store. The only eyewitness was defendant's son, Mario, then two and a half years old.

---

[1] Penal Code sections 187, 190.2, subdivision (a)(18), 12022, subdivision (b). All further undesignated statutory references are to the Penal Code.

[2] Sections 190.2, subdivision (a)(17), 211.

[3] Section 190.4.

[4] Section 1239, subdivision (b).

These facts are undisputed. Contested at trial was what specific crimes defendant had committed. While the prosecution alleged first degree murder, robbery, and attendant special circumstances, defendant contended he was guilty only of manslaughter or second degree murder and innocent of robbery.

### 2. Prosecution Evidence

Lo Bue worked at the store along with defendant's wife, Yvonne Chatman.[5] Yvonne usually worked from 9:00 a.m. to 6:00 p.m., while Lo Bue worked from 2:00 or 3:00 p.m. until 6:00 p.m. On the day of the killing, Yvonne opened the store but falsely told her supervisor that she had to leave because her husband and son had been in an automobile accident. Yvonne returned home, and Lo Bue was called to take her place. Yvonne testified that around 3:00 p.m., defendant left their apartment with their son, Mario. Defendant said they were going to the park, but instead took the boy to the store. Independent witnesses saw defendant there with Lo Bue until the 6:00 p.m. closing time. Lo Bue did not appear to be afraid of defendant.

Mario was seven years old at the time of trial, and testified he saw his father stab the victim. Mario remembered that the knife came from a yellow box, but did not recall when he first saw it. Defendant was the only person Mario saw handle the knife. After the stabbing, defendant ran home with Mario. Mario could not remember whether defendant carried him. At home, both defendant and Mario took a shower. Mario said he thought he took the shower because Mario had blood on his hands.

Around 7:15 p.m., passerby Curtis Jones saw the store apparently unattended with the door ajar. On closer inspection, Jones saw Lo Bue's body and called the police.

The crime scene was in disarray, the walls spattered with blood. Most of the blood was less than three feet from the floor, indicating the victim had been stabbed while crouching or reclining. Carpeting behind the main counter was soaked with blood. The cash drawer lay empty on the counter. There was no blood on the cash register. A safe under the side counter was open. An envelope unmarked by blood and containing over $100 in cash, along with checks and deposit slips, remained in the safe. According to a notation on the envelope, it contained the store proceeds from October 6, minus $150. October 7 proceeds were missing. It appeared the safe had been opened after the stabbing, because the door was spattered with blood but the interior was

---

[5] Because defendant and his wife share a common surname, we refer to Ms. Chatman by her given name to avoid confusion.

not. The victim's purse was found under the counter. It was covered in blood but still contained a wallet with about $27 in cash. An envelope containing less than $2 was recovered from one of the countertops. A telephone receiver had been torn from the wall. Defendant's fingerprint was found on a photocopy machine.

The store video surveillance camera was inoperable on the day of the stabbing. Yvonne knew the camera did not work. She might have told defendant this, but she could not recall.

Yvonne heard defendant come home that evening. Shortly thereafter she saw her husband and son standing in bloody water in the tub. Defendant was flustered and had scratches on his chest. Something he said caused her to go to the store, where she saw Lo Bue's body being removed. When she returned home, defendant was excited. She saw cash and checks in a moneybag like one used at the photo shop. Defendant's finger was badly cut. He told Yvonne's mother, Mary Irving, that he had gotten cut while either fighting or robbing someone. Later the same evening, at defendant's insistence, defendant, Yvonne, Mario, and Irving went to East Palo Alto, where they purchased crack cocaine, using money defendant had taken from the store. The three adults smoked the drugs in a motel room.

The next day, when police came to the apartment, Yvonne spoke to them while defendant hid in the bathroom. Yvonne reported that she had not been to work because her "boyfriend" and son had been in an automobile accident, and she had spent the previous night at the boyfriend's home. After the police left, defendant told Yvonne that if she "told that he did it, he would . . . get me and my family, he would drag us all into it." Yvonne and defendant separated shortly thereafter.

Defendant lived with Tina Whaley for several months in 1988. She testified defendant told her he had killed a woman at the Photo Drive Up. He said the victim was acting as if she were high on drugs, and while they spoke she pulled a knife on him. Defendant disarmed the victim, and stabbed her "quite a few times" because "she kept coming back. He said she wouldn't die." He stabbed her "all over from the neck down, chest, stomach, everywhere." The victim "went for the phone and he pulled it out of the wall." After the stabbing he took about $500 from the cash register, ran home with his son, and showered. He also burned his clothes. He told his wife what happened, and threatened to kill her if she told anyone. That evening, along with his wife, son, and mother-in-law, defendant used money he took from the store to buy crack cocaine, which the adults smoked in a motel.

Rosalind Wathel was defendant's girlfriend in Houston, Texas, for about eight months in 1989. She testified that defendant described the incident and

seemed to be bragging. He told Wathel he had gone to the shop with his son to collect some photographs. "[H]e wasn't happy with the photos, and . . . he had stabbed the girl that was there" repeatedly. After he stabbed her, "he robbed her to go get some more crack cocaine and alcohol." He said the girl begged him to stop, and that "the more she asked him to stop the more he kept stabbing," because "[i]t felt good." He said that "[i]t just start[ed] feeling good and he just kept doing it even after she had got quiet." He told his wife and "made her promise not to tell. . . . [S]he got afraid and left, and took the baby."

William Speed testified defendant told him that he had stabbed someone in a fight and he "kind of" seemed to be bragging. He said he stabbed the person in the neck and "the person was gurgling, kind of choking on his own blood."

The murder weapon was never found. According to witnesses, no knives were kept in the store. Lo Bue's sister testified that the victim never carried one. Shortly after the killing, Yvonne and her mother, Mary Irving, noticed that a distinctive kitchen knife was missing from their home. Yvonne last saw the knife a couple of days before the killing. Its handle was about four inches long with a blade between seven and a half and 10 inches long. The blade was about an inch and a half wide at the hilt and narrowed to a point. It was the only sharp knife the family owned.

Yvonne's sister, Denise Taylor, also testified Mary Irving told her that defendant said he stabbed the victim, who was gasping and gagging for air. At trial, Irving denied that defendant had said this to her or that she had repeated such a statement to anyone.

An autopsy revealed that Lo Bue died from exsanguination and asphyxiation due to a collapsed lung. Of the 51 separate knife wounds she sustained, seven were defensive wounds to the hands and forearms. On the front of the body, there were two life-threatening neck wounds. One severed the jugular vein; the other cut through the esophagus and trachea. While not immediately fatal, the latter wound would have caused labored breathing, accompanied by a gurgling sound. The frontal wounds cut through all layers of the skin and into the underlying tissue. They would have bled extensively.

Three of the back wounds were quite serious. They penetrated the chest cavity and completely pierced the right lung. They caused significant bleeding, collapsing the lung and resulting in an inability to breathe. Eight other back wounds cut through the skin, fatty tissue, and perhaps into underlying muscle, but did not enter the chest cavity. Thus wounded, Lo Bue would have died after the lapse of several minutes.

The injuries were inflicted by a single-blade knife of undetermined length and width. The wounds did not seem to follow a pattern and were inflicted from varying angles, with the assailant in varying positions. The victim had no alcohol or drugs in her system.

The police arrested defendant in Houston, Texas, on April 24, 1990. He was found hiding in a closet.

### 3. *Defense Evidence*

Defendant admitted stabbing Lo Bue. He testified that he went to the store around 3:00 p.m. to talk with her about his troubled marriage. He did not have a knife. After the store closed, Lo Bue told him that "Yvonne had confided in her that she wasn't happy with the relationship as far as me not having a full-time job." Lo Bue said that "she told [Yvonne] that she should go ahead and separate from me and find somebody . . . that she could be happy with." These words "hit me like a ton of bricks and I became very upset, because at that time I didn't know she was giving my wife advice." He "started talking loud and said some things that I shouldn't have said." Lo Bue appeared frightened. At this point, Mario said something and defendant turned toward the boy. When he turned back toward Lo Bue, she had a knife in her hand and ordered him to leave. He took the knife from her, cutting his finger in the process. Once armed, "I guess you would say in a blind rage I started stabbing her with it." He stabbed Lo Bue until she was dead.

When Mario said something like, "Daddy, I want to go home," defendant stopped stabbing Lo Bue. He left the store, taking the knife, some money, and a telephone with him. He "yanked [the phone] out of the wall." He was "panicking," and took the knife and phone because they contained his fingerprints. He did not decide to take any money until after the stabbing. He did so as an "afterthought" to give the appearance of robbery. He took the money from a counter and put it in a store bag with everything else. He ran home with his son as fast as he could. He went straight into the shower with his son, who had blood on him from being carried by defendant. He told Yvonne what had happened and she left the bathroom, taking the items he had brought from the business. Yvonne later burned checks taken from the business. She told him that she had thrown some of the other items away, including the knife and phone, but not the money. Defendant also told Mary Irving what had happened. Later they went to East Palo Alto, where they spent the night in a motel. Yvonne and Irving bought drugs. He did not go with them to make the purchase, but all three smoked the drugs.

Defendant denied threatening Yvonne initially. Later, when she threatened to tell the police, he said that if she did, he would tell the police about her

involvement. He told Tina Whaley what had happened, but denied saying he had threatened to kill Yvonne. He did not tell her that the stabbing took a long time, saying instead that "it happened all so fast." Defendant denied telling Rosalind Wathel anything about the stabbing. They "never talked about it period. I left all that behind me when I went to Texas." Although he admitted telling William Speed about the stabbing, he denied bragging or saying anything about a gurgling sound. Defendant knew the store had a camera, but denied that Yvonne told him it did not work.

Defendant presented several other witnesses, some in an attempt to impeach Rosalind Wathel. Regina Pickens-West was Wathel's friend. Although Wathel had testified that Pickens-West was present when defendant told her about the incident, Pickens-West testified she never heard defendant mention stabbing anyone. Wathel had testified that she reported defendant's statements to a Houston police officer named Chris. Houston Police Officer A.G. Christal, known as Officer Chris, testified that he sometimes spoke with Wathel, but she never reported that her boyfriend confessed to a stabbing. Other witnesses testified that Wathel voluntarily submitted to a day of psychological testing in Houston.

Additional defense evidence included testimony from an astronomer regarding the available light on the evening of the stabbing. Photos of the crime scene came in through the testimony of a defense investigator. A paramedic described the appearance of Lo Bue's body. Tina Whaley testified she had been convicted of embezzlement in 1988. Candy Howard testified that once around October 8, 1987, when she lived in East Palo Alto, Yvonne and her sister came to her home in the middle of the night to buy crack cocaine. No man was with them. Yvonne paid with a $100 bill. San Jose Police Sergeant George Padilla testified about previous statements some prosecution witnesses had made.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

Yvonne testified that about three weeks after the stabbing, defendant choked her into unconsciousness. Tina Whaley testified that defendant told her that he had once "started strangling [Yvonne], and that she passed out." He thought she had died.

Whaley and others testified that in late December 1988, about two months after Whaley and defendant separated, defendant burned Whaley's apartment after discovering her there with another man. The arson investigator testified that six separate fires were set throughout the apartment. According to

Rosalind Wathel, defendant told her that he had found a former girlfriend in bed with someone else, and that "he set the place on fire." He watched from a distance while firefighters fought the blaze.

Wathel also testified that she and defendant once argued because she wanted to use food stamps to buy food while defendant wanted to "cash" them and buy crack cocaine. He struck her face with his fists and cut her forehead with a kitchen knife, leaving a scar. After she fell to the floor, "he literally took his boots and kicked me in the vagina constantly until I passed out." When she regained consciousness, defendant was smoking cocaine. He told her that if she had not "come to, he wanted to know what he was going to do to dispose of my body."

A witness testified that around 1981, defendant assaulted him and another custodian at a high school. A police officer testified that in February 1981, defendant also assaulted him at the high school while the officer was off duty.[6]

Salvador Lo Bue, the victim's father, testified about the killing's impact on himself and his family.

### 2. *Defense Evidence*

Defendant testified at length about his life, including his unhappy childhood. His father was African-American and his mother Caucasian. His father, an alcoholic, beat him with a belt throughout his childhood. Other than the beatings, he had little interaction with his father. He testified about meeting Yvonne and the birth of his son. The day Mario was born was "the happiest day of my life." One day, when defendant and Yvonne took Mario to meet defendant's father, his three younger siblings told him their father had been beating them. The father appeared and started beating his sister with a belt. The father saw defendant, went into the bedroom and got a gun. He had pointed a gun at defendant once before. Defendant called the police and never saw his father again.

Regarding the choking of Yvonne, defendant said he simply grabbed her by the coat collar and she passed out. He said she "had the look of smoking crack," and denied squeezing her neck. He admitted the incident to Tina Whaley, but insisted he described it just as he had done at trial. He admitted the arson at Tina's apartment. He had been drinking, and intended to leave her with nothing, "like I was being left with nothing." As to the Rosalind

---

[6] Testimony regarding the high school assaults was presented in rebuttal, as part of a reopened case-in-chief.

Wathel assault, he maintained that certain injuries she attributed to him preexisted their acquaintance. He said she would drink a great deal and would sometimes pass out in the apartment.

Defendant said he could not ask for forgiveness because what he had done was so terrible, but he hoped the jury could understand why he did it. "Violence became a part of my life and as I grew older I used violence to solve problems which wasn't right, but that's what I did." He said he wanted to live.

There was testimony about defendant's family, school record, and employment history. Witnesses included two of his boyhood neighbors, two teachers, and several employers at various jobs predating and following the murder. He was generally a good worker. Defendant's younger brother, Jason, testified about living with their father and about the time their father pulled a gun. A former Palo Alto police officer also testified about that event.

One of defendant's high school friends and two of his cousins testified about the high school incidents, largely exonerating defendant.

### 3. Rebuttal and Surrebuttal

In rebuttal, one of defendant's former employers testified that once, when he confronted defendant with complaints, defendant tried to punch him in the face. A juvenile probation officer impeached portions of defendant's testimony. He testified that while defendant was living with his mother in 1980, a petition against him was sustained in juvenile court and he was placed on formal probation.

In surrebuttal, a boys ranch counselor testified about defendant's good behavior there. A juvenile probation officer testified about his report regarding the assault on the off-duty officer.

## II. Discussion

### A. Denial of Motions to Disqualify Trial Judge and Related Misconduct Claim

Defendant twice moved to disqualify the trial judge, John T. Ball. Both times, another superior court judge heard and denied the motion under Code of Civil Procedure sections 170.1 and 170.3. Defendant challenges these rulings as erroneous, and contends the facts underlying the second motion demonstrate judicial misconduct. We disagree.

1. *Facts*

Before jury selection began, Judge Ball told the parties that 14 or 15 years previously, his daughter had been robbed at knifepoint while working at a photo shop. The judge accompanied his daughter to a live lineup and to the preliminary hearing where she testified and identified the robber. Defendant moved for Judge Ball's disqualification. The judge filed an answer reaffirming these facts and adding that the "incident in question is dim and distant in my mind." His daughter was an adult at the time, had not lived with him for about five or six years, and had not been injured. They had not discussed the incident in over 10 years. He went on to attest, "I did not make nor do I presently have the slightest connection with the event occurring to my daughter and the pending matter before me. I in no way feel bias, prejudice regarding the defendant nor for that matter any person charged with a crime as a result of my daughter's victimization." The motion was assigned by stipulation to another judge and denied.

After return of the penalty verdict but before rulings on postverdict motions, defendant again moved to disqualify Judge Ball. In his motion he cited the previous grounds, and added allegations that: "[O]n December 14, 1992, after the death verdict, Judge Ball approached the rail dividing the well of the courtroom from the spectators and spoke to the victim's father [who had testified at the penalty phase]. The Judge mentioned how he (the Judge) knew it has been very hard. Mr. Lo Bue responded about the fact that he (the defendant) took his baby's life, and that his (the defendant's) life should be taken." Defendant supplied a supporting declaration by John Aaron, who had been in the courtroom. Aaron said that he could not "remember what was said verbatim or what else was said but the encounter lasted about forty seconds. I do not recall who spoke first."

In Judge Ball's answer, he stated: "During the trial there were various times wherein Mrs. Lo Bue, mother of the victim, would lose her composure and speak out. Concern was expressed on the occasions and, upon request and I believe without request, admonishments were given to the jury. On these occasions, when present, Mr. Lo Bue, father of the victim, would attempt to control and console his wife. On December 14, 1992, . . . after the jury reached its verdict, Mr. Lo Bue accosted me in the courtroom when I returned to the courtroom to deliver items to my clerk, and attempted to apologize for his wife's conduct. My best recollection is that I merely acknowledged his concern and indicated it was understandable and that he should not concern himself with the matter. I extended the same courtesy to him that I would have extended to anyone expressing anxiety. I specifically cut short his statements, and by my conduct indicated my inability to discuss the matter further with him. The comments regarding the Defendant's

punishment and the loss of his daughter were addressed to my Deputy and not to me. The only comment I heard related to the apology for his wife's conduct." He denied that his daughter's experience or his feelings or statements to the victim's father affected his feelings toward defendant or the charges.

By stipulation, the motion was assigned to a different judge from the one who had heard the first disqualification motion. The second motion was denied. The judge concluded an evidentiary hearing was unnecessary: "[T]he second incident was handled appropriately by Judge Ball . . . [H]e still maintains and maintained throughout that incident the appearance of impartiality."

### 2. *Analysis*

Defendant asserts the motions to disqualify should have been granted. At trial, he relied primarily on Code of Civil Procedure section 170.1, subdivision (a)(6)(C), which provided that a judge is disqualified if "a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. . . ."[7] He also argued that "[a] biased decision maker is constitutionally unacceptable," citing *Withrow v. Larkin* (1975) 421 U.S. 35 [43 L.Ed.2d 712, 95 S.Ct. 1456]. That case stated that " 'a fair trial in a fair tribunal is a basic requirement of due process.' " (*Id.* at p. 46.)

### a. *Preservation of the Claim*

The Attorney General urges defendant did not challenge these rulings by a pretrial writ, thus forfeiting the right to complain on appeal. He is partially correct. Code of Civil Procedure section 170.3, subdivision (d), provides: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding." This provision governs both peremptory challenges[8] and those made for cause.[9] (*People v. Hull* (1991) 1 Cal.4th 266, 272–275 [2 Cal.Rptr.2d 526, 820 P.2d 1036].) In *People v. Brown* (1993) 6 Cal.4th 322, 335 [24 Cal.Rptr.2d 710, 862 P.2d 710] (*Brown*), we held a claim based on the *statute* was barred, but that a *constitutionally* based challenge asserting judicial bias could be raised on appeal.

---

[7] Although section 170.1 has since been renumbered and amended, the current substantive provisions of Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii), are identical.

[8] Code of Civil Procedure section 170.6.

[9] Code of Civil Procedure section 170.1.

■ In *Brown*, the defendant did file a pretrial writ. We noted that a defendant "may, and should, seek to resolve such issues by statutory means, and that his negligent failure to do so may constitute a forfeiture of his constitutional claim." (*Brown, supra*, 6 Cal.4th at p. 336.) We have subsequently indicated, however, that a defendant who raised the claim at trial may always "assert on appeal a claim of denial of the due process right to an impartial judge." (*People v. Mayfield* (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485] (*Mayfield*).)[10] While defendant may not raise the statutory claim on appeal, he may assert a constitutionally based challenge of judicial bias. (*Brown*, at p. 335.)

### b. *Merits of the Constitutional Claim*

As noted, the statute requires the disqualification of a judge whenever "a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, former subd. (a)(6)(C), see now subd. (a)(6)(A)(iii).) The Attorney General argues the constitutional standard is narrower. He cites *Bracy v. Gramley* (1997) 520 U.S. 899 [138 L.Ed.2d 97, 117 S.Ct. 1793], where the high court explained that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. [Citation.] Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. [Citations.] But the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' [citation], before a judge with no *actual* bias against the defendant or interest in the outcome of his particular case." (*Id.* at pp. 904–905, italics added.) Accordingly, the Attorney General argues that the due process claim requires a showing of actual bias, whereas the statute requires only the appearance of bias. We need not further address the distinction because defendant has failed to show even the appearance of bias.

Potential bias and prejudice must clearly be established by an objective standard. (*In re Scott* (2003) 29 Cal.4th 783, 817 [129 Cal.Rptr.2d 605, 61 P.3d 402].) "Courts must apply with restraint statutes authorizing disqualification of a judge due to bias." (*Ibid.*)

Under this standard, there was no error. Defendant's allegations in support of his disqualification motions "simply do not support a doubt regarding [the

---

[10] See also *People v. Williams* (1997) 16 Cal.4th 635, 652, and footnote 5 [66 Cal.Rptr.2d 573, 941 P.2d 752] (issue forfeited because defendant agreed at trial to have the judge hear the case; moreover, statutory, *but not constitutional*, claim would have been forfeited because of failure to bring a pretrial writ proceeding).

trial judge's] ability to remain impartial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 50 [17 Cal.Rptr.3d 710, 96 P.3d 30], fn. omitted.) The mere fact that Judge Ball's daughter had been the victim of a knifepoint robbery at a photograph store many years before does not disqualify him. Judges, like all human beings, have widely varying experiences and backgrounds. Except perhaps in extreme circumstances, those not directly related to the case or the parties do not disqualify them.[11] In this case, the judge stated unequivocally that he made no connection between the earlier robbery and the present case. " '[W]e of course presume the honesty and integrity of those serving as judges.' " (*Mann v. Thalacker, supra,* 246 F.3d at p. 1097.)

■ The judge's brief encounter with the victim's father shortly after the jury's penalty verdict likewise did not require his disqualification. Judge Ball did not seek out the encounter. The victim's father approached him to apologize for his wife's behavior. The judge merely listened briefly and expressed sympathy, extending "the same courtesy to him that I would have extended to anyone expressing anxiety." While a judge in any case must ensure that every litigant receives a fair trial, no rule precludes a judge from treating members of the public with courtesy. To require that the judge here simply turn his back on the father would do nothing to make the proceedings fairer to defendant. The entitlement of a criminal defendant to a fair trial must never be compromised. Yet the criminal justice system does not exist for the benefit of criminal defendants alone. Parents of murder victims also have a stake in the criminal justice system. Courts may also consider, and be sensitive to, the needs and concerns of crime victims and their families.

Defendant contends the judge ruling on the second motion should have taken testimony to resolve asserted factual discrepancies between Judge Ball's account and that of the witness, John Aaron. A hearing was unnecessary. Judge Ball's account was more complete than Aaron's, but it was not inconsistent. Aaron acknowledged he was recounting only part of the conversation, and could not remember who spoke first. Thus, Aaron's observations were fragmentary, and contained nothing to cast doubt on Judge Ball's more inclusive statement. Given the circumstances, Judge Ball handled the impromptu incident with the victim's father appropriately.

Defendant argues that, standing alone, the father's statement that defendant's life should be taken requires the judge's disqualification. The argument fails. It is immaterial whether the comment was directed to the bailiff or the judge, and whether the judge heard it directly, through staff, or in connection with defendant's motion. It is clear that the judge did not solicit the comment.

---

[11] See *Mann v. Thalacker* (8th Cir. 2001) 246 F.3d 1092, 1096–1097 (fact that trial judge had *personally* been the victim of sexual abuse many years earlier did not disqualify him in a sex abuse case).

During a trial any number of things come to a judge's attention beyond the strict confines of the written record. Among these are the reactions of spectators manifested by their facial expressions and other behavior, before, during, and after court sessions. Indeed, judges must be aware of these things as part of their diligent trial management and their responsibility to ensure that jurors remain unaffected by them. Likewise, judges are often asked to rule on the admissibility of evidence they ultimately exclude. Judges are required to set this information aside, just as jurors are instructed to do when evidence is stricken.

In this case, given the father's testimony during the penalty phase, it was hardly a revelation that he favored the death penalty. Certainly the father should not have approached the judge. Such conduct is inappropriate, as would be a plea from a defendant's family to spare their loved one. Yet events of this nature do happen. Capital cases unfold in a crucible of strong emotions. Courts cannot expect that families will always conform their behavior to the standards of trained professionals. However, the court system must function in the face of occasionally imperfect behavior from the public. The record contains no evidence that the father's comment influenced the court's rulings. No reasonable person would doubt that a judge could remain impartial merely because of a brief encounter that the murder victim's father initiated *after* the penalty verdict.[12]

### B. *Jury Selection*

■ Defendant contends the court erred in excluding two prospective jurors because of their views on the death penalty. "The applicable law is settled. The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties. (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485].) 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' (*Ibid.*)" (*People v. Smith* (2003) 30 Cal.4th 581, 601–602 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*); see also *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].) This record reveals no basis to overturn the court's rulings.

The first prospective juror responded to the jury questionnaire that she opposed the death penalty. During voir dire, she was equivocal whether her

---

[12] Defendant also argues the trial judge committed prejudicial misconduct during this encounter with the victim's father. We reject the argument for the same reasons.

views would affect her ability to perform her duties, and was questioned extensively. When asked whether she could impose the death penalty, she vacillated, and often expressed considerable uncertainty. Ultimately, she said she could not honestly say whether she could consider voting for a death sentence. In excusing her, the court explained, "I think in grasping the totality of her responses, I think it's clear to the court that her views would prevent or substantially impair her performance [of] her duty as a juror . . . . I think she had a clear and adequate opportunity to express the ability to state she could choose and her inability to state that choice is highly probative to the court, and I'm going to excuse her on that basis." Under these circumstances, we defer to the trial court's determination.

The second prospective juror stated in the questionnaire that he strongly opposed the death penalty, and would not set aside his personal feelings to follow the law as the court explained it. During voir dire, he agreed that his views would substantially impair his ability to make the sentencing choice. He said it would be "incredibly" hard for him not to have a reasonable doubt if the death penalty were involved. When asked whether he still felt that he could not set aside his feelings and follow the law, he responded, "I would certainly try to, but in something like that it's very difficult how I feel about it would not enter into my decisions." These statements support the trial court's ruling.

### C. Guilt Phase Issues

#### 1. Alleged Misconduct by the Victim's Mother

Defendant contends that certain actions by the victim's mother require reversal.

#### a. Facts

During jury selection, defense counsel stated that Mrs. Lo Bue was speaking loudly and emotionally to the prosecutor's wife in the presence of some prospective jurors. At defense counsel's request, the wife was sworn and testified in limine. She related that Mrs. Lo Bue had said "this was very difficult for her," but said nothing about the case. Defense counsel stated he did *not* want any of the prospective jurors who might have heard Mrs. Lo Bue to be excused. He also withdrew an earlier request that the prospective jurors be questioned about what they might have heard. The court admonished Mrs. Lo Bue to keep her voice "well modulated."

During defendant's guilt phase testimony, Mrs. Lo Bue stated, "Excuse me, can you put the microphone close, please?" A short time later, when

defendant testified that he had repeatedly stabbed the victim "in a blind rage," Mrs. Lo Bue interrupted by saying, "Are you satisfied now?" The prosecutor asked the court whether it wanted to take a recess. At that point, Mrs. Lo Bue said, "No, no I promise. I'm sorry." The court told her, "I'm going to have to admonish you . . . that you have to refrain from speaking in any way or you will have to leave the courtroom," and "Any more outbursts and I'll have to ask you to leave." She repeated that she was "sorry."

Defense counsel submitted a proposed instruction telling the jury it "must decide this case solely on the evidence presented here in the courtroom" and "completely disregard any display of emotion, words spoken, or feelings received from the presence of spectators including the mother of Ms. Lo Bue." Not wanting to single out any individual, the court agreed to give the requested instruction omitting the reference to Mrs. Lo Bue. Defense counsel sought no further admonition. Before the guilt phase argument, at defense counsel's request and outside the presence of the jury, the court "admonish[ed] all individuals present in the courtroom that during these proceedings any type of conduct that can be noticed by the jury, any sounds or motions or direction is entirely inappropriate and would cause serious concern by the Court. And I certainly don't want to exercise my authority in excluding any individual from the proceedings, but if there's any form of outburst or disruption, conduct that is inappropriate, I will be forced to take that action."

During a break in defense counsel's argument, outside the presence of the jury, defense counsel stated that two or three times during his argument, Mrs. Lo Bue had made some "sounds," and at least one or two jurors looked at her each time. He requested that the court "ask her not to whisper or make any sounds until we're finished." The district attorney, who sat between her and the jury, expressed the opinion that she had spoken only very softly, and that "her conduct has been appropriate and exemplary at this point." Defense counsel said that he merely wanted the court to restate the admonition. The court stated that it had "informally asked my staff at the break, my deputy, clerk and reporter, and each have indicated to me, and the Court will indicate that it has not noticed any commotion or conduct that I would consider justifying exclusion or further restraint by the Court." Nevertheless, at defense counsel's request, it admonished Mrs. Lo Bue "to try and contain yourself as much as humanly possible during these proceedings." She said, "I'll try."

During guilt phase instructions, the court told the jury, at defendant's request, that it "must decide this case solely on the evidence presented here in the courtroom" and "must also completely disregard any display of emotion, words spoken, or feelings received from the presence of spectators."

During Mr. Lo Bue's penalty phase testimony he described going to the morgue and seeing his daughter's body. Mrs. Lo Bue spoke up and said, "I do too. I did too." Later, outside the jury's presence, defense counsel claimed that before and during Mr. Lo Bue's testimony, counsel had also heard "some audible sobbing from that area where the Lo Bue family" was sitting. He moved for a penalty mistrial. The prosecutor agreed that "the fact that she was tearful is apparent," but he argued that "even if she weren't here, every juror would assume that she would be acting precisely in that fashion." The court denied the mistrial motion. It did not "believe the jury is unduly prejudiced as a result of the conduct as it would be something that would be assumed by the jury, and I believe the instructions are sufficient to cure any prejudice occurring." It readmonished the jury that it "must decide this case solely upon the evidence presented here in the courtroom" and "must also completely disregard any display of emotion, words spoken or feelings received from the presence of spectators. And you're reminded of this instruction and admonished to follow it closely."

The trial then proceeded without further interruptions.

b. *Analysis*

Defendant contends Mrs. Lo Bue's behavior requires reversal. The Attorney General initially responds that this claim is not cognizable on appeal. He is partially correct. At the guilt phase, the court did everything defendant asked of it regarding Mrs. Lo Bue's behavior. It investigated the facts and admonished Mrs. Lo Bue both upon request and sua sponte. It gave defendant's requested jury admonitions. Defendant did not move for a guilt phase mistrial. "A defendant's failure to object to and request a curative admonition for alleged spectator misconduct waives the issue for appeal if the objection and admonition would have cured the misconduct." (*People v. Hill* (1992) 3 Cal.4th 959, 1000 [13 Cal.Rptr.2d 475, 839 P.2d 984] (*Hill*).) Similarly, a defendant who receives a curative admonition, but who makes no other objection and seeks no other action, may not complain on appeal. Defendant may not argue that the court should have granted a mistrial he did not request, and the strictures of double jeopardy could, in any event, severely restrict such an action. (See generally *People v. Upshaw* (1974) 13 Cal.3d 29, 33, [117 Cal.Rptr. 668, 528 P.2d 756].)

At the penalty phase defendant unsuccessfully sought a mistrial, and his challenge to the denial of that motion is therefore cognizable. (See *Hill, supra,* 3 Cal.4th at p. 1000, and cases cited therein.)

There are no grounds for reversal here. The trial court intervened correctly to demand appropriate behavior and to cure any impropriety. Spectator

misconduct is a ground for mistrial if it is "of such a character as to prejudice the defendant or influence the verdict." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022 [245 Cal.Rptr. 185, 750 P.2d 1342] (*Lucero*).) In *Holbrook v. Flynn* (1986) 475 U.S. 560, 572 [89 L.Ed.2d 525, 106 S.Ct. 1340], the Supreme Court framed the federal constitutional question as whether what the jury "saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial. . . ." The trial court is entrusted with broad discretion to determine whether spectator conduct is prejudicial. (*Lucero*, at p. 1022.)

Here, several incidents cited as misconduct are easily disposed of. Having investigated defendant's complaints of loud speech or other sounds, the court essentially found no conduct perceptible to the jury. The remaining challenges involve two incidents: (1) Mrs. Lo Bue's interruption of defendant's testimony to say, "Are you satisfied now?" and (2) her interjection that she too had viewed her daughter's body.

A trial is the recreation of a human event. When the event involves life and death, the aftermath for all those affected is profound and emotions run high. Courts must be vigilant to ensure that the proper legal resolution is untainted by extraneous influence. Anticipatory rulings and directions are appropriate, as are curative admonitions. Different people manage grief, anger, loving support, and other human feelings in different ways. Surely, we would not say that the mother of either the victim or the accused should be excluded from the courtroom simply because she might act beyond the strictures of accepted legal deportment. Courts have a responsibility to manage this reality but they cannot ignore it.

"[B]ecause a spectator does not wear the same cloak of official authority as a prosecutor, most instances of spectator misconduct will likely be more easily curable than those of a prosecutor." (*Hill, supra*, 3 Cal.4th at p. 1000.) Mrs. Lo Bue's outbursts "were unrelated to defendant's guilt or innocence . . . ." (*Id.* at p. 999; cf. *Lucero, supra*, 44 Cal.3d at pp. 1022–1023 [no prejudice even though the outburst at issue "may have informed the jury of facts outside of the record"].) They provided the jury with no significant information it did not already know or might not readily surmise. Even without observing Mrs. Lo Bue in person, any reasonable juror would know that the crime had caused the victim's family anguish. Under the circumstances, " 'prejudice is not presumed. Indeed, it is generally assumed that such errors are cured by admonition, unless the record demonstrates the misconduct resulted in a miscarriage of justice.' " (*Hill*, at p. 1002, quoting *Lucero*, at p. 1023, fn. 9.) This particular record establishes no prejudice.

The trial court acted within its discretion in denying the mistrial motion. (*Lucero, supra*, 44 Cal.3d at p. 1024.) Whether a particular incident is

incurably prejudicial requires a nuanced, fact-based analysis. The trial court is entrusted with broad discretion in ruling on mistrial motions. (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) Here, there was no abuse of discretion, and no unmet "special ' "need for reliability" ' " in the penalty decision. (*Johnson v. Mississippi* (1988) 486 U.S. 578, 584 [100 L.Ed.2d 575, 108 S.Ct. 1981].) We are confident that these outbursts did not yield a verdict based on caprice, or on impermissible or irrelevant factors. (*Id.* at p. 584.)

### 2. *Admission of Prosecution Evidence*

Defendant contends the court erroneously admitted three items of evidence.

#### a. *The Victim's Purse*

The victim's purse was recovered at the crime scene. Defendant objected to admission of its contents, which included personal items he considered irrelevant and unduly prejudicial. The prosecutor argued the contents were relevant in light of defendant's theory. In opening statement, his counsel urged that defendant did not take money from the purse, thus indicating that robbery was not a motive. The prosecutor argued that the large number of other items in the purse might have deterred defendant from taking the time to rifle through it for money. The court initially overruled the objection. Defense counsel then argued that the record did not indicate exactly where the money had been kept in the purse. At that point, the court withheld a final ruling pending any further testimony on the question. There was no additional evidence. The purse and contents were admitted.

Defendant particularly challenges admission of various items, including the victim's driver's license and picture as well as other photographs with personal messages written on the back. The Attorney General concedes that the court erred in admitting the contents, and we accept that concession without further comment. We conclude that the conceded error, if any, was harmless. There is no indication that the jurors searched through the purse's contents. Even had they done so, there is no reasonable probability that the presence of some personal items in the purse affected the guilt verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The jury acquitted defendant of robbery and rejected the related robbery-murder special-circumstance allegation, demonstrating that it "considered the evidence dispassionately in reaching its verdict." (*Smith, supra,* 30 Cal.4th at p. 613.) The jury quite properly received extensive evidence that a young woman was repeatedly and fatally stabbed. It viewed her autopsy photographs. The admission of her driver's license and a few personally annotated

pictures could not conceivably have rendered the trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

### b. *Defendant's Drug Use*

■ Before trial, defendant moved to exclude evidence that he used crack cocaine. The court ruled that the prosecution could not present generalized evidence that defendant used drugs. It did allow testimony that defendant used money stolen from the store to buy and use drugs in order to show that he had a motive for robbery. Relying on *People v. Holt* (1984) 37 Cal.3d 436, 449–450 [208 Cal.Rptr. 547, 690 P.2d 1207], and *People v. Cardenas* (1982) 31 Cal.3d 897, 906–907 [184 Cal.Rptr. 165, 647 P.2d 569], defendant assigns error. There was none. The rule from those cases "is that evidence of an accused's narcotics addiction is inadmissible where it 'tends only remotely or to an insignificant degree to prove a material fact in the case . . . .' " (*Cardenas*, at p. 906.) Whether defendant went to the store intending to steal or only decided to take the money after the murder was an issue hotly contested. Evidence that, shortly after the incident, defendant wanted to acquire and consume cocaine was directly relevant on the question of whether he had a preexisting motive to steal. The court properly admitted this limited evidence of drug use while excluding more generalized evidence not directly connected with the crime. (See also *People v. Felix* (1994) 23 Cal.App.4th 1385, 1392–1396 [28 Cal.Rptr.2d 860] [holding evidence of heroin use admissible to show burglary motive].)

### c. *Mario's Nightmares*

■ Over defense objection, the court permitted Yvonne to testify that after the stabbing, Mario had nightmares and would wake up screaming. Defendant contends the evidence was irrelevant. The contention fails. The trial court has wide discretion in determining relevance. (*People v. Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) The very brief testimony was not the lynchpin of the case, but did have a "tendency in reason to prove . . . any disputed fact . . . of consequence to the determination of the action." (Evid. Code, § 210.) Mario, who was two and a half years old at the time of the crime, testified at trial. The jury might well have considered whether he saw and understood the events in question when determining what weight to give his testimony. The nightmare evidence was germane to the evaluation of Mario's testimony.

### 3. *Exclusion of Impeachment Evidence*

Defendant contends the trial court violated his right to confront witnesses by excluding proffered impeachment of his wife and sister-in-law.

■ The applicable law is settled. " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431] (*Van Arsdall*), quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 94 S.Ct. 1105].) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*Van Arsdall, supra,* 475 U.S. at pp. 678–679 . . . .) California law is in accord. (See *People v. Belmontes* (1988) 45 Cal.3d 744, 780 [248 Cal.Rptr. 126, 755 P.2d 310].) Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, supra,* 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) We examine defendant's specific contentions in this legal context.

### a. *Yvonne's Welfare History*

■ Based on Yvonne's welfare records, defendant asserted that she had committed perjury. She received welfare while working and living with defendant, but falsely represented under oath to the contrary. Although Yvonne had never been charged with such an offense, he sought to confront her with this evidence. The court excluded the inquiry to the extent defendant offered it as general impeachment. It indicated, however, that the evidence might be admissible if defendant could show that when talking to police Yvonne might have been concerned about being prosecuted for welfare fraud. It offered to hold an in limine hearing, but none was requested. Evidence Code section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938] (*Wheeler*).)

Yvonne did not come before the court as a model of rectitude. The jury learned, among other things, that she lied to her employer and to the police. Coming home to find her husband and son washing off blood in the family tub, she went to her place of employment to find a coworker's body being removed. She returned to find cash and checks, apparently from the store, in her apartment. She did not report these facts to authorities.

Instead she accompanied her mother, husband, and child on an excursion to purchase narcotics. While additional evidence of any welfare malfeasance might have been relevant, it is most unlikely to have cast Yvonne in a much more negative light.

"[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra,* 4 Cal.4th at pp. 296–297, fn. omitted.) The court acted within its discretion by refusing to permit defendant, in effect, to prosecute Yvonne for welfare fraud, particularly in the absence of any evidence directly connecting the alleged fraud with her testimony.

### b. *Taylor's Misdemeanor Conviction*

Defendant sought to impeach Denise Taylor with a misdemeanor conviction for giving false information to a peace officer. The court excluded the evidence "after weighing [its] probative versus [its] prejudicial value." Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion. (*Wheeler, supra,* 4 Cal.4th at pp. 297–300.) The court's ruling was proper.

Although defendant argues here that the court should have admitted evidence of the underlying conduct, he made no such argument at trial, did not ask to present any such evidence, and made no offer of proof. Accordingly, we do not know what the underlying conduct was, whether or how it would have been significant, how defendant would have attempted to prove it, or whether he could have done so. Normally, this circumstance would make the claim noncognizable. (Evid. Code, § 354, subd. (a); *People v. Valdez* (2004) 32 Cal.4th 73, 108 [8 Cal.Rptr.3d 271, 82 P.3d 296] (*Valdez.*) Interestingly, the Attorney General concedes cognizability, and we accept the concession. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93] (*Champion*).)

Turning to the merits, it is difficult to judge the correctness of a ruling the court was never asked to make. However, the Attorney General's concession of cognizability, which defendant joins, assumes that the court would have excluded the evidence, so we will operate on that assumption. It is also difficult to judge whether the court would have erred in excluding the evidence when the record does not disclose what that evidence would have been—other than involving a false statement to a peace officer under unknown circumstances for an unknown purpose. However, the record presents

no basis to conclude that excluding the evidence would have been an abuse of the court's broad discretion. (See *Wheeler, supra,* 4 Cal.4th at pp. 296–297.)

### c. *Taylor's Probation Status*

During recross-examination, defendant sought to impeach Taylor with a felony conviction for welfare fraud and evidence that "a couple of weeks ago," she had been placed on probation for drug possession in Santa Clara County. He argued that her probation status was relevant because of differences between her redirect testimony. and her previous statements. The prosecutor responded that there was no evidence Taylor was attempting to curry favor with the prosecution. Until he questioned Taylor at trial, he had not spoken with her since the preliminary hearing. The court admitted Taylor's conviction but excluded her probation status as more prejudicial than probative.

The ruling was within the court's discretion. There was neither evidence nor offer of proof that Taylor had spoken with anyone in law enforcement about the case around the time of her placement on probation or thereafter. The court did not bar defendant from seeking to show that Taylor had received benefits or promises for her testimony; it only prohibited evidence of her probationary status untethered to any specific showing that it could have affected her testimony. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1050–1051 [90 Cal.Rptr.2d 607, 988 P.2d 531].) In short, defendant has failed to demonstrate that "the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility . . . .' [Citation.] Accordingly, we find no abuse of discretion." (*Id.* at p. 1051.)

### 4. *Exclusion of Expert Testimony*

Prosecution witness Rosalind Wathel, a resident of Houston, Texas, testified on October 20, 1992. Five days earlier, she had submitted to psychological testing at the Houston office of defense psychologist, Dr. Kit Harrison. Wathel testified that the day before the testing, two defense investigators "came and told me that the following day I had to take a psychological test." The investigators picked her up the next day and took her to Dr. Harrison's office, where, according to Wathel, they "gave me all types of psychological tests." These included "playing with blocks, looking at these plat tests," and two written tests, one with about 600 questions. The testing lasted all day. Dr. Harrison and three defense investigators testified that Wathel voluntarily agreed to the testing.

Over the prosecutor's objection, defendant sought admission of the test results along with Dr. Harrison's expert opinion to impeach Wathel's credibility. As an offer of proof, Dr. Harrison testified in limine. Under his supervision, his staff administered a battery of psychological tests. Some evaluated "brain function," while others were "more psychological." Dr. Harrison said the testing showed that Wathel is "moderately impaired" in a variety of ways, including "intellectual memory, language, learning, sensory perceptual and motor areas." "She has memory problems primarily with visual memory as opposed to auditory or visual memory. Visual memory was markedly impaired." "Her actual auditory processing of information was okay," but she "demonstrates confabulations in her memory and she perseverates." "Confabulation is filling in of details when you have a memory disease." "Perseveration means you keep applying . . . the same solution to a different problem." She is moderately impaired "in terms of understanding speech." "She basically demonstrated signs of a character disorder, chemical dependency, marked inability to cope with life, some not lucid touch with reality, particularly under stress, where it's moderately out of touch with reality."

After hearing argument and consulting existing case law, the court excluded the test results and Dr. Harrison's opinion, but permitted him to testify that he administered the tests. The court noted that the authorities have generally not permitted witness impeachment by psychiatric testimony, at least in cases not involving sex offenses. The court found that "most of what Dr. Harrison testifies [to] is clearly within the province of proper cross-examination which could demonstrate all of these characteristics for the jury so that they could be able to determine the credibility of this witness." It also found that any probative value the evidence might have was outweighed by its prejudicial effect "in terms of what would be involved if we were to in effect enter into expert testimony as to the various components of this alleged impairment or her ability to recall the specific probative parts of her testimony. And I believe it is . . . appropriate for the jury to determine her credibility, not any expert witness."

■ Defendant assigns error. Similar issues have been raised in the context of a defense motion for an order of psychiatric examination. In that context, we have explained that there is a "judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony. [Citations.] California courts have viewed such examinations with disfavor because ' "[a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify the issues; the testimony may be

distracting, time-consuming and costly." ' " (*People v. Alcala* (1992) 4 Cal.4th 742, 781 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; see also *People v. Manson* (1976) 61 Cal.App.3d 102, 137 [132 Cal.Rptr. 265] ["The nature of the charges in this case is such that psychiatric testimony for purposes of impeachment would be extraordinary"].)

These concerns are magnified here, where a defense psychologist simply undertook the examination without notice, involvement, or even awareness, on the part of the court or opposing counsel. Here there were no "partisan psychiatrists" who might cloud the issues, but a single psychologist hired for the sole purpose of seeking impeaching evidence. Moreover, permitting evidence of this nature, generated only because defense investigators induced the witness to submit to a day's worth of testing, raises substantial concerns about protecting witness privacy. Wathel testified that the two investigators who spoke with her the day before the testing told her she "had to" submit to the testing. Three investigators were involved in getting her to the testing site. They and Dr. Harrison all said she submitted voluntarily. We take this testimony at face value, and assume that they did nothing improper in this case, and that Wathel voluntarily submitted to the testing.

Nonetheless, encouraging litigants to engage in this kind of trial preparation is fraught with the potential for abuse. We are most hesitant to suggest that witnesses, without notice or any opportunity to seek advice, could properly be subject to assertions that they "have to" submit to psychological testing. In this case, Wathel was subjected to full cross-examination and impeachment by other, more traditional, methods. The trial court's ruling was fully consistent with the general judicial policy disfavoring testimony of this nature.

Defendant argues that the 1982 adoption of California Constitution, article I, section 28, subdivision (d), which generally provides that "relevant evidence shall not be excluded in any criminal proceeding," has changed previous law and mandates admission of this evidence. However, that constitutional provision also expressly "preserve[s] the trial court's discretion to exclude evidence whose probative value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time. (Evid. Code, § 352.)" (*Wheeler, supra,* 4 Cal.4th at p. 295.) Accordingly, that provision does not affect the general policy against admitting this kind of evidence, based on the principles of Evidence Code section 352.

Defendant cites some cases in which he asserts the prosecution was allowed to present similar evidence, and suggests that the rules be equally applied. The argument fails on its presupposition. The cases he cites bear no similarity to this one. Some involve general expert testimony regarding

typical responses of sex crime victims and their relatives. (E.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1302 [283 Cal.Rptr. 382, 812 P.2d 563].) Others do involve expert evidence regarding the mental state of prosecution witnesses, but in wholly different contexts and for different purposes. In *People v. Herring* (1993) 20 Cal.App.4th 1066 [25 Cal.Rptr.2d 213], the reviewing court upheld the admission of evidence that a sexual assault victim was mentally retarded. The evidence was relevant to the issue of the victim's lack of consent. (*Id.* at pp. 1071–1073.) The Court of Appeal noted the general policy against impeaching witnesses by expert psychiatric testimony, but found no abuse of discretion in that case, partly because the expert did not opine that the mental retardation affected the witness's credibility. (*Id.* at pp. 1072–1073.) In *People v. Stark* (1989) 213 Cal.App.3d 107 [261 Cal.Rptr. 479], a school psychologist testified that one witness had a "learning disability that affects his ability to sequence events and put events in chronological order." (*Id.* at p. 112.) There, the witness's physical appearance could have caused the jury to exaggerate his learning disability, and the psychologist's testimony was helpful to "ward off potential preconceived notions about retardation based on physical appearance in the minds of lay jurors." (*Id.* at p. 114, fn. 4.) Nothing in these cases compels the admission of the evidence proffered here.

Defendant also argues that because the prosecution elicited testimony from Wathel on direct examination that she had submitted to the examination under coercion, he had to be allowed to present the results to prevent the jury from speculating that the testing might have shown that she was credible. In response to this argument at trial, the court permitted Dr. Harrison to testify about "how long she was there, [and] what tests he administered." Defendant could additionally have asked the court to admonish the jury not to speculate what the results might have been, but he did not do so. There was no abuse of discretion.

### 5. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during cross-examination and argument.

#### a. *Cross-examination of Defendant with "Were They Lying" Questions*

Defendant challenges the following portions of the prosecutor's cross-examination:

Over defense counsel's objection the question was "argumentative," the prosecutor asked defendant why Tina Whaley and Rosalind Wathel, "who live

in two different states in the United States, 1500, 2,000 miles apart, both claim that you said to them that you drove a brown Seville?" Defendant responded that he did not know. The prosecutor asked whether he thought the women were lying. He responded, "My opinion, yes." Then the prosecutor asked, "Do you think that these women bear a grudge against you?" Defendant said, "Yes."

Without objection, the prosecutor asked if defendant "had any idea how Rosalind is able to come into Court and tell us these things about a Photo Drive Up when she's been living for the last eight years in Harris County, Houston, Texas?" Defendant responded, "Yeah, somebody obviously had to tell her."

Over defense counsel's objection that "speculation about somebody else is irrelevant," the prosecutor asked, "Do you think [Wathel] dislikes you now?" Defendant answered, "Yes." The prosecutor asked, "Do you think based upon that she's willing to come out to California several times to lie about you?" Defendant answered, "Yes." Defense counsel objected and moved to strike the answer on the basis that "it's irrelevant what he thinks." The prosecutor responded, "I'm trying to understand, because he knows her better than anyone else in this courtroom. And he said what she says is not true, so I'm trying to understand why he thinks she's lying."

Without objection, the prosecutor asked, "You don't know how this woman [Wathel] . . . knows that you went to a Photo Drive-Up booth with your son and murdered a young girl?" Defendant answered, "Yes, because me and her never had that conversation." The prosecutor asked, "Just one of those awful coincidence[s] that she knows those things?" Defendant answered, "Somebody told her what had happened. Me and her never had that conversation whatsoever."

Defendant denied that he was bragging about the killing despite Whaley's and Wathel's testimony to the contrary. The prosecutor then asked whether Whaley was "lying" in this regard. When he answered, "Yes," the prosecutor asked why she was lying. He answered, "That I can't say. Maybe they took it as the way I was telling them. Maybe to them I was bragging, I don't know. To me I wasn't bragging because I had a serious look on my face, and I was basically crying about it. So I don't see how they could take it as bragging." The prosecutor asked, "Did something happen in your relationship with Tina Whaley that perhaps might cause her to feel poorly about you?" Defendant answered, "It may have." The prosecutor asked, "Do you think that's why she's lying about you?" He answered, "Could be." The prosecutor asked, "Mr. Chatman, you seem to have a lot of people who are lying about you. Why do you think that is?" He answered, "That I can't really say." The

prosecutor asked, "Do you think perhaps that you're the cause of these people, that that's why they're saying these things about you?" Defense counsel objected "under 1101" (i.e., Evid. Code, § 1101) and also "speculation." The court overruled the objection, and defendant answered, "I would say no."

Without objection, the prosecutor questioned defendant about William Speed's testimony: "There's another person who's come and lied about you?" "Was there a reason why, that you know of, why he is coming in and lying about you?" and "Well, why do you think?" Defendant said he could not "speculate, I don't know." The prosecutor asked, "Why do these people keep coming in and saying these things about you?" Defendant answered, "I cannot say why they would say them things. They have their reasons for what they're doing," but he did not know what they were.

Without objection, the prosecutor three times asked whether a particular item of evidence was another example of someone lying.[13] Each time, defendant answered, "Yes."

Without objection, the prosecutor asked how the safe was opened. Defendant said he could not say; he never touched the safe. The prosecutor asked, "Well, is the safe lying about you?" Again, defendant said he did not know, and that he could "only say I never touched it."

Defendant argues the "prosecutor committed misconduct by repeatedly asking [him] to comment on the veracity of other witnesses." He claims that the questions "invaded the province of the jury," elicited improper lay opinion about the veracity of witnesses, and constituted misconduct by intentionally eliciting inadmissible testimony.

At the outset, we question whether this issue is properly considered one of misconduct. "Although it is misconduct for a prosecutor *intentionally*

---

[13] First, the prosecutor asked, "[I]t's alleged that Mary Irving told Denise Taylor that you had described to her again a certain gurgling noise that [the victim] made . . . . [W]as that something that you did say?" Defendant said, "No." The prosecutor asked, "Again, it's another example of someone saying these lies about you?" Defendant replied, "Yes."

Second, the prosecutor asked defendant about Tina Whaley's testimony that defendant had said he threatened to harm Yvonne if she revealed his participation in the capital crime. The prosecutor asked, "[I]s it true that . . . you told Tina that?" Defendant said, "No." The prosecutor said, "So, again, it's another lie, somebody saying something false about you?" Defendant replied, "Yes."

Finally, the prosecutor mentioned Rosalind Wathel's testimony that defendant told her he had threatened his wife if she revealed his participation presumably in the capital crime. The prosecutor asked, "Is that true that you told Rosalind Wathel about that?" Defendant answered, "No." The prosecutor asked, "And, again, it's another example of someone saying something false about you?" Defendant replied, "Yes." The prosecutor said, "It seems like it's sort of you against everyone else, doesn't it?" Defendant said, "Yes."

to elicit inadmissible testimony (*People v. Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217]), merely eliciting evidence is not misconduct. Defendant's real argument is that the evidence was inadmissible." (*People v. Scott* (1997) 15 Cal.4th 1188, 1218 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Although the prosecutor in this case certainly asked the questions intentionally, nothing in the record suggests he sought to present evidence he knew was inadmissible, especially given that the court overruled defendant's objections and, as discussed below, the applicable law was unsettled at the time of trial. But whether we label the issue misconduct or the erroneous admission of evidence does not greatly matter, for defendant's argument is essentially identical under either characterization. Because the cases generally discuss the issue under the rubric of misconduct, we will do so also.

The Attorney General argues first that the claim is not cognizable because defendant did not properly object. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2] (*Samayoa*).) Defense counsel did object to a number of "were they lying" questions as argumentative, speculative, and irrelevant. The court overruled these objections, indicating generally that it would permit this line of questioning. Thus, with one exception,[14] we conclude a request for a jury admonition or the lodging of further objections would have been futile. Additional objections were not necessary to preserve the claim. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Defendant may argue on appeal that the questions were improper for the reasons asserted at trial: that they were irrelevant, speculative, or argumentative.

■ Before turning to those grounds, we address defendant's argument that the questions "invaded the province of the jury." It is a truism that it is for the jury to determine credibility. Questions that legitimately assist the jurors in discharging that obligation are proper. The "legal cliche used by many courts, [that evidence] would 'invade the province' or 'usurp the function' of the jury" is, as Dean Wigmore has said, " 'so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric,' and 'remains simply one of those impracticable and misconceived utterances which lack any justification in principle.' " (*People v. McDonald* (1984) 37 Cal.3d 351, 370 [208 Cal.Rptr. 236, 690 P.2d 709], quoting 7 Wigmore on Evidence (Chadbourne rev. ed. 1978) §§ 1920, 1921, pp. 18, 22.)

---

[14] As subsequently discussed, defendant's failure to object to the prosecutor's question regarding the safe forfeits the issue on appeal. (See *post*, at p. 384.)

Defendant cites to such cases as *People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741], for the proposition that "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." *Melton* and similar cases involved lay opinion from those who had no personal knowledge of the facts. Such opinions are of little assistance in deciding the credibility of testimony by percipient witnesses who do have personal knowledge. There is a difference between asking a witness whether, in his opinion, another is lying and asking that witness whether he knows of a reason why another would be motivated to lie.

We now turn to defendant's claim that the prosecutor's questions were argumentative, or called for irrelevant or speculative testimony. *People v. Zambrano* (2004) 124 Cal.App.4th 228, 238 [21 Cal.Rptr.3d 160] (*Zambrano*) was the first California case to determine the propriety of such questions,[15] and provides an example of improper "were they lying" questions. Zambrano was arrested for selling cocaine to two undercover officers. At trial, both officers testified to the circumstances of the transaction. Zambrano testified that he had been working at the business where the sale allegedly took place, but denied involvement in any drug transaction. Instead, he testified that one of the officers approached, "put a gun to his neck, threw him on the ground and handcuffed him." (*Zambrano*, at p. 233.) On cross-examination, the prosecutor repeatedly asked defendant if the officers were lying and whether " 'everybody is lying except for you?' " (*Id.* at p. 235.)

As the *Zambrano* court held, the district attorney's questions called for irrelevant and speculative testimony. It was clear that the defendant was testifying to a diametrically different set of circumstances from that recounted by the officers. The differences could not have been attributed to mistake or faulty recall. The defendant, a stranger to the officers, had no basis for insight into their bias, interest, or motive to be untruthful. Had the prosecutor asked why they might lie, which she did not, it would have been apparent that any answer would have been speculative. Under these circumstances, the questions did not develop facts regarding the defendant's own testimony. They "merely forced defendant to opine without foundation, that the officers were liars." (*Zambrano, supra,* 124 Cal.App.4th at p. 241.)

Courts from various jurisdictions have treated "were they lying" questions differently. One line of cases concludes they are always improper, while another concludes they are never so. (*People v. Foster, supra,* 111 Cal.App.4th

---

[15] *People v. Foster* (2003) 111 Cal.App.4th 379 [3 Cal.Rptr.3d 535] had discussed but not resolved the issue. Defendant's reliance on federal cases is misplaced. Those cases involve application of the Federal Rules of Evidence (28 U.S.C.). They interpret a similar statutory framework but they do not establish constitutional principles binding on the states.

at p. 384.) *Zambrano* joins a third line of cases that counsels a trial court to consider these questions in context. (*Zambrano, supra,* 124 Cal.App.4th at p. 239.)

If a defendant has no relevant personal knowledge of the events, or of a reason that a witness may be lying or mistaken, he might have no relevant testimony to provide. No witness may give testimony based on conjecture or speculation. (See Evid. Code, § 702.) Such evidence is irrelevant because it has no tendency in reason to resolve questions in dispute. (Evid. Code, § 210.)

In challenging a witness's testimony, a party implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed. A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable.

The permissible scope of cross-examination of a defendant is generally broad. "When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. [Citation.] A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 822 [281 Cal.Rptr. 90, 809 P.2d 865] (*Cooper*).)

A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken. When, as here, the defendant knows the other witnesses well, he might know of reasons those witnesses might lie. Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses. There is no reason to categorically exclude all such questions. Were a defendant to testify on direct examination that a witness against him lied, and go on to give reasons for this deception, surely that testimony would not be excluded merely because credibility determinations fall squarely within the jury's province. Similarly, cross-examination along this line should not be categorically prohibited.

Here defendant took the stand and put his own veracity in issue. He urged that a number of witnesses should not be believed, but that he should be. The jury had to determine whose testimony to credit. It is one thing for a witness to assert that he had a better vantage point from which to observe an event, or that his memory is superior to one who was inattentive or has given inconsistent accounts. It is another thing entirely for a witness to claim that witness after opposing witness has lied. Defendant was not asked to opine on whether other witnesses should be believed. He was asked to clarify his own position and whether he had any information about whether other witnesses had a bias, interest, or motive to be untruthful.

It was permissible for the prosecutor to clarify defendant's own position in this regard. It was also permissible to ask whether he knew of facts that would show a witness's testimony might be inaccurate or mistaken, or whether he knew of any bias, interest, or motive for a witness to be untruthful. The cross-examination was legitimate inquiry to clarify defendant's position. The questions sought to elicit testimony that would properly assist the trier of fact in ascertaining whom to believe.

Defendant had personal knowledge of the conversations he had with the other witnesses, and they were all friends or relatives. He could provide relevant, nonspeculative testimony as to the accuracy of their information and any motive for dishonesty. If he provided a reason for one of them to have testified inaccurately, the jury could consider that reason for whatever value it believed it had. If he provided no reason, the jury might also consider the fact that not even defendant, who, as the prosecutor pointed out knew the witnesses better than anyone else in the courtroom, could think of any reason why their testimony should not be credited.

The "were they lying" questions regarding other witnesses generally called for and received an actual answer. For example, in answering a question regarding the witnesses' testimony that defendant was bragging, he provided an alternative reason for the discrepancy. He said that he was not bragging, but because of his demeanor, someone might have erroneously thought he was. Moreover, the "were they lying" questions were brief and were generally precursors to followup questions as to whether defendant knew of any *reason* the witnesses had to lie. At least when, as here, the defendant knows the witnesses well, we think questions regarding any basis for bias on the part of a key witness are clearly proper.

■ The prosecutor's question about whether the safe was "lying" requires a different analysis. The question was argumentative.[16] An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable. The prosecutor's question whether "the safe [was] lying" is an example. An inanimate object cannot "lie." Professor Wigmore has called cross-examination the "greatest legal engine ever invented for the discovery of truth." (5 Wigmore on Evidence (Chadbourne rev. ed. 1974) § 1367, p. 32.) The engine should be allowed to run, but it cannot be allowed to run amok. An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all. Defendant had already explained he had no explanation for the safe being open. Asking whether the safe was "lying" could add nothing to this testimony.

■ Defendant claims his attorney was incompetent for not objecting to this question. "However, deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*).) Deficient performance has not been shown. Further, it is not reasonably probable that "a determination more favorable to defendant would have resulted" had the question been objected to and disallowed, particularly since the jury *acquitted* defendant of robbery. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*).)

■ In sum, courts should carefully scrutinize "were they lying" questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions.

b. *Argument to the Jury*

While defendant now complains of several prosecution arguments, only once did he object below. Because an admonition could easily have cured any harm, his contentions, with the one exception, are not cognizable. (*Hillhouse*,

---

[16] Defendant did not object to this question. The trial court's rulings regarding questions as to whether a *witness* was lying did not make futile an objection to the qualitatively different question whether an *inanimate object* was lying. Accordingly, defendant's failure to object to this question precludes him from challenging it on appeal. (*Samayoa, supra,* 15 Cal.4th at p. 841.)

*supra*, 27 Cal.4th at p. 501.) Defendant claims his attorney was incompetent for not objecting, but this is not one of those rare cases in which the failure to object establishes ineffective assistance of counsel. (*Id.* at p. 502.) In any event, as to each claim, there was either no misconduct or no prejudice.

### 1) *Discrepancy Between Opening Statement and Defendant's Testimony*

The prosecutor argued that a discrepancy between defense counsel's opening statement and defendant's testimony demonstrated that defense counsel "does not fully accept and believe his client's testimony." The court sustained a defense objection. When asked to give an admonition, the court told the jury that "counsel's statements are not to be construed as evidence in this matter. And I think that you may proceed along that basis, [prosecutor], without references to what [defense counsel] may believe." Without further objection, the prosecutor continued to point out discrepancies between defense counsel's statements and defendant's actual testimony. During the rebuttal argument, the prosecutor said, "I ask you why was there no argument suggesting to you that his statement was in fact believable? Why was there no attempt to explain to you meaningfully why this person should be believed when we have him lying boldface already on the tape recorder? And how can we say disregard that but believe this?"

Defendant contends the prosecutor improperly argued that defense counsel did not believe his client. It is "improper for the prosecutor to argue to the jury that defense counsel does not believe in his client's [case]." (*People v. Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].) But the court sustained defendant's objection and, at defense counsel's request, admonished the jury. Any prejudice was cured. (*People v. Jones* (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960] (*Jones*).) Defendant contends the admonition was inadequate. However, he did not seek any additional admonition. The admonition, including the court's pointed comment that the prosecutor may proceed without reference to what defense counsel may believe, adequately informed the jury that such reference was improper and should be ignored. Defendant also claims that the prosecutor repeated his misconduct in his later argument in rebuttal. Because he did not object, this claim is not cognizable. In any event, the prosecutor never again argued that defense counsel disbelieved his client. He merely commented on discrepancies between defense counsel's opening statement and defendant's actual testimony, and pointed out gaps in defense counsel's argument. "It is no misconduct to pointedly highlight, as the prosecutor did here, the contradictions in a defendant's case." (*People v. Welch* (1999) 20 Cal.4th 701, 753 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

### 2) *Comment on Dr. Harrison's Testimony*

Defendant argues that the prosecutor committed misconduct in both his opening and rebuttal argument in connection with Dr. Harrison's testimony regarding Rosalind Wathel. (See *ante*, pt. II.C.4.)

In opening argument, the prosecutor said, "Can anyone . . . tell us why the defense chose to, and I'll use the expression, shanghai Rosalind Wathel on October 15th, 1992. . . . She testified on the 19th. Four days before her testimony they drag her to a psychologist in Houston. Chatman was arrested two years and four months ago. Were they that desperate that they would drag her to a psychologist so she could play with blocks and look at ink blots? Do any of you find this somewhat revolting that a witness, not a prosecution witness or a defense witness, but just a witness, was taken without a Court order in another city to be examined by a psychologist. Do any of you find this wrongfully intrusive? These are very private things. And it also should be noted that the psychologist's testimony, which cost $4,500, did not alter by one iota the information available to you to decide this case." The prosecutor then discussed in detail the testimony by Officer Christal and Regina Pickens-West that defendant offered to impeach Wathel. He concluded this discussion by saying, "Instead of wild goose chases, there should be real evidence presented on behalf of the defense which validly attacked her. Such was not the case. This is what's important."

Defendant contends this argument was an improper comment on the absence of evidence of Wathel's alleged mental impairment. He argues that the prosecutor may not argue that the defense has failed to prove something when the defense was precluded from doing so because of the prosecutor's objection. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 430–431 [79 Cal.Rptr.2d 408, 966 P.2d 442].) It is not reasonably likely that the jury interpreted the comments this way. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*).) The first portion of these comments focused on the alleged impropriety of the defense investigators' subjecting Wathel to psychological testing. It did not imply what the results of that testing might have been. The second part, referring to "wild goose chases," came after lengthy discussion of matters unconnected to the psychological evaluation. It is not reasonably likely the jury would associate that comment with the earlier discussion of the testing.

Defendant's challenges to rebuttal must be evaluated in light of the defense argument to which it replied. Defense counsel discussed Wathel's testimony in detail, then argued, "Where she got all these ideas I don't know. We didn't get into all of that as far as the brain function, but what does she say, what's the core? . . . She's just adding, confabulating. She's filling in all these details

from a core that she got somewhere . . . ." The prosecutor then argued on rebuttal, "The discussion of Rosalind Wathel this morning was fascinating. . . . We had Rosalind going to a shrink, a psychologist, and then all of a sudden within a sentence we have Rosalind has mental problems. Well, I'm sorry, there is no evidence of that. He was here. There was no evidence of that. You can reread his testimony, albeit so very short, there was no evidence of that. You evaluate Rosalind's testimony based upon what you saw and what she said." Later, the prosecutor said of Wathel's testimony, "If you can find a reason to discredit that testimony, then work with it. But all their horses, all their men and all their sources and all their shrinks have been incapable of discrediting this testimony."

Had the prosecutor made these latter comments in his opening argument, the trial court might well have sustained an objection and admonished the jury that no evidence was presented regarding the results of Dr. Harrison's examination. Instead, the comments responded to defense argument that could be interpreted as suggesting that Dr. Harrison did find mental problems. As such, they were intended to neutralize the defense argument. Taken in this light, they were reasonable rebuttal. Under the circumstances, defense counsel might reasonably have chosen not to object. In any event, there was no prejudice under any standard. The jury knew Dr. Harrison had expressed no opinion regarding Wathel's mental state.

### 3) *Alleged Denigration of Counsel*

Defendant claims the prosecutor improperly denigrated defense counsel. We have reviewed each of defendant's claims and conclude they lack merit. The district attorney sometimes denigrated the defense *case*, including the defense evidence, but he did not denigrate defense counsel personally. "Because the focus of [his] comment was on the evidence adduced at trial, rather than on the integrity of defense counsel, it was proper." (*Frye, supra*, 18 Cal.4th at p. 978.)

### 4) *Comments About Defendant*

The prosecutor said, at various times, that defendant lied at trial; that he was unwilling to accept or admit responsibility for what he had done; that he lacked remorse or emotion; that he was dangerous; that he bragged about the murder; that defendant lacked humanity; that defendant was frightening; and that the jury had "before you a man, and I use that term 'man' in this context very broadly. We have a man who's going down for the third time." Defendant now claims these comments improperly denigrated him. The unobjected-to comments were all based on the evidence and came within the broad scope of permissible argument. (*People v. Wharton* (1991) 53 Cal.3d 522, 567 [280 Cal.Rptr. 631, 809 P.2d 290].)

Defendant relies on two cases, neither of which causes us to find misconduct here. In *Darden v. Wainwright* (1986) 477 U.S. 168, 180 [91 L.Ed.2d 144, 106 S.Ct. 2464], the United States Supreme Court stated in general that various prosecutorial jury arguments "undoubtedly were improper," although it found no prejudice. Among the many comments the high court cited was the prosecutor's referring to the defendant as an "animal." (*Id.* at p. 179.) The court did not specifically single out use of the word "animal" as improper. (*Id.* at p. 180.)

The prosecutor here commented on evidence that defendant tortured a woman to death in the presence of his two-year-old son. The argument was forceful but supported by the evidence. We see no similarity between the remarks here and the overall argument condemned in *Darden*. In *Dubria v. Smith* (9th Cir. 1999) 197 F.3d 390, the court condemned the prosecutor's argument that the defendant, whom he described as a " 'piece of garbage,' " was fabricating his defense. (*Id.* at p. 402.) The argument implied that the prosecutor had personal knowledge that the jury did not. The court concluded that the prosecutor both expressed an improper personal opinion on the defendant's guilt and improperly "denigrat[ed] the defense as a sham." (*Ibid.*) It did not state that referring to the defendant as a " 'piece of garbage,' " (*ibid.*) by itself, would have been improper if the reference had been based solely on the evidence. The argument made here was qualitatively different and permissible.

### 5) *Appeal for Sympathy*

One disputed issue was whether the torture-murder special circumstance was true. Regarding this issue, the prosecutor argued, "I want you to think for a moment, go back in time if you can . . . to that night October 7th, 1987, and to think about how that violence started. And clearly at the time that that knife was pulled on Rosellina, how it was brought out, how desperate she must have been, she was willing to grab on to the blade of an open knife in order to defend herself. And I want you to also think about the pain that that must cause to have your flesh sliced open to the bone, not one time, but multiple times. And I'm sorry that this is the difficult things we have to discuss, but I held off. I think it is time we do so now because the defense has raised the issue of torture . . . . And I want you to think then what it's like then to be down on the ground. Your hands have been slashed open. How useless. How helpful are they now? And you are slashed repeatedly. And what are you thinking? When is it going to end? Am I going to die? Is this it? And if I'm going to die, why doesn't he just cut my throat? Why doesn't he knock me out? That doesn't happen."

Defendant claims this argument was an improper appeal to the jury's sympathy for the victim. Although generally "an appeal for sympathy for the

victim is out of place during an objective determination of guilt" (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756]), the argument was specifically directed to the torture issue. While the victim's awareness of pain is not an *element* of the torture-murder special circumstance (*People v. Cole* (2004) 33 Cal.4th 1158, 1228 [17 Cal.Rptr.3d 532, 95 P.3d 811] (*Cole*)), it is not *irrelevant*. Asking the jury to consider the victim's pain was directly relevant to a disputed issue. We agree, however, that the rhetorical questions at the end of this discussion might have moved from appropriate argument regarding torture to an improper attempt to invoke sympathy. The trial court might well have sustained an objection to this part of the argument had defendant made one. But the main thrust of this argument, that defendant tortured his victim, was permissible; any impropriety in the latter comments was harmless.

### 6) Sufficiency of the Evidence Regarding Torture

Defendant contends the evidence is insufficient to support his conviction of first degree murder and the finding of the torture-murder special circumstance. In determining evidentiary sufficiency, the court reviews the entire record, in the light most favorable to the judgment, for the presence of substantial evidence. Substantial evidence is evidence sufficiently reasonable, credible, and of such solid value "that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The same standard of review applies in considering circumstantial evidence and the support for special circumstance findings. (*Valdez, supra*, 32 Cal.4th at pp. 104–105.) Sufficient evidence supports the jury's verdict.

The court instructed on four theories of first degree murder: (1) deliberate and premeditated murder, (2) robbery felony murder, (3) torture-murder, and (4) murder by lying in wait. The jury apparently rejected the felony-murder theory, acquitting defendant of robbery and finding not true the related robbery-murder special-circumstance allegation. The prosecutor's deliberate and premeditated murder and lying-in-wait theories rested in part on defendant's having gone to the store intending to rob. Accordingly, it is not clear that the jury relied on either of these theories. Because the jury found true the torture-murder special circumstance and because murder by torture constitutes murder in the first degree (§ 189), we focus on that theory.

Murder by torture requires a killing committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. It need not be proven that the victim actually suffered pain. However, there must be a causal relationship between the torturous act and

death. (*People v. Elliot* (2005) 37 Cal.4th 453, 466–467 [35 Cal.Rptr.3d 759, 122 P.3d 968] (*Elliot*).) The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the body. We have, however, cautioned against giving undue weight to the severity of the wounds. Horrible wounds may be as consistent with a killing in the heat of passion or an explosion of violence, as with the intent to inflict cruel suffering. (*Id.* at p. 467.)

Here defendant stabbed Lo Bue over four dozen times. Six life-threatening wounds to the neck, back, and chest, while quite serious, were not immediately fatal. The location of most of the blood spatters supports a conclusion that the young woman was on or near the floor when the majority of the wounds were inflicted. Because her trachea was slashed, she would have experienced labored breathing and made gurgling sounds as she struggled to bring air into a lung ultimately pierced through several times. Blood flowing around the lung finally prevented it from expanding with air. It would have taken a number of minutes for Lo Bue to expire.

During the attack, defendant inflicted scores of wounds, many on an unresisting victim. They were distributed over the victim's face, head, neck, and both the front and back of her torso. In contrast to life-threatening wounds that injured major organs or penetrated into the chest cavity, the autopsy surgeon described many of the wounds as "superficial." He clarified, however, that they were not mere scratches. They severed all layers of the skin and went into the underlying tissue, to various depths, producing gaping injuries. They would have caused significant bleeding. Some of the wounds were in clusters; others were widely separated.

Defendant told Rosalind Wathel that his victim begged him to stop but he persisted because it "felt good," and that "he just kept doing it even after she got quiet." He told Tina Whaley that the victim "kept coming back" and that she "just wouldn't die." Both Wathel and William Speed described defendant as bragging about the killing.

Defendant testified that he committed the act in a frenzy, but the evidence supports a different conclusion. There were no knives at the shop and the victim did not carry one. There was, however, a distinctive knife missing from the family home. From this testimony the jury could have found that he took the knife with him and lied at trial about taking the knife from the victim.

Hilt marks are left when an attacker plunges a knife so forcefully into a body that the blade penetrates all the way to the hilt and the impact causes bruising. A frenzied attack might involve such injuries. No hilt marks were found in connection with any of the 51 wounds.

By his own account, as Lo Bue lay dead or dying, defendant put money and checks from the store, along with the murder weapon and a telephone receiver bearing his fingerprints, into a bag and left the scene with his child. Once home, he washed blood from himself and his son. Later that night, he took his family with him and bought cocaine, which he shared with his wife and mother-in-law at a rented motel room.

Considering the totality of these facts, the jury had more than ample support for its conclusion that defendant acted with the willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for a sadistic purpose.[17] It was not required to accept, and was justified in rejecting, defendant's testimony to the contrary.

Defendant challenges Wathel's credibility, as he did at trial, but her credibility was for the jury, not a reviewing court, to determine. (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304 [228 Cal.Rptr. 228, 721 P.2d 110].) Her testimony was consistent with the physical evidence.

Defendant also argues that he did not bind the victim. Binding may take place in some instances of torture, but is not required to prove it. (*Elliot, supra,* 37 Cal.4th at p. 468, fn. 4.) Based on the circumstances here it appears that defendant did not need to resort to binding to overpower and control his victim.

The evidence also supports the true finding as to the torture-murder special circumstance. "To find the torture-murder special circumstance true, the jury had to find that '[t]he murder was intentional and involved the infliction of torture.' (§ 190.2, subd. (a)(18).)" (*Elliot, supra,* 37 Cal.4th at p. 469.) At the time of the crime, section 190.2, subdivision (a)(18), also provided that torture required "proof of the infliction of extreme physical pain no matter how long its duration." (§ 190.2, subd. (a)(18) as approved by the voters, Prop. 7, § 6, Gen. Elec. (Nov. 7, 1978); see *People v. Wade* (1988) 44 Cal.3d 975, 993 [244 Cal.Rptr. 905, 750 P.2d 794]; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 140, fn. 14 [36 Cal.Rptr.2d 474, 885 P.2d 887] [noting statute has been amended in this regard].) Here, as we have explained, the nature of the victim's many wounds and the circumstances surrounding the killing support the conclusion that defendant intended to kill her, that the murder involved torture, and that defendant inflicted extreme physical pain.

---

[17] See, for example, *People v. Bemore* (2000) 22 Cal.4th 809, 839–844 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*) (upholding torture-murder special circumstance where most of the 37 knife wounds were superficial, and where eight shallow cuts were grouped on the victim's flank, away from vital organs.)

### 7) *Instructional Issues*

#### a. *Instructions on Lesser Included Offenses*

The court gave instructions on second degree murder and voluntary manslaughter as lesser included offenses. Defendant claims the instructions could have informed the jury that convictions for the lesser crimes of second degree murder, voluntary manslaughter, and involuntary manslaughter required an intent to kill. His theory as to all of these contentions is essentially the same—the jury might have found he did not intend to kill his victim and, in that event, it would have had no choice but either to convict him of first degree murder or to acquit him entirely.

We need not decide whether the court should have instructed differently, because the jury found that the torture-murder special circumstance was true. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392].) The court instructed that a torture-murder special circumstance requires the intent to kill. (See § 190.2, subd. (a)(18); *Elliot, supra,* 37 Cal.4th at p. 469.) When the jury found this special circumstance true, it found defendant intended to kill under other properly given instructions. That being the case, it could have found defendant guilty of either second degree murder or voluntary manslaughter, even under defendant's interpretation of the court's instructions, had it doubted that the remaining elements of first degree murder were proven. The special circumstance finding also shows the jury rejected any possible theory supporting involuntary manslaughter.

#### b. *Causation*

First degree torture murder requires a causal relationship between the torturous act and the death. (*Cole, supra,* 33 Cal.4th at p. 1207.) The trial court concluded the evidence raised no question of causation and did not directly instruct the jury on this requirement. Instead, it gave instructions identical to those given in *Cole,* at pages 1207–1208. As in *Cole,* defendant ascribes error. We reject the contention as in *Cole.* The court told the jury that "murder which is perpetrated *by torture* is murder of the first degree." (Italics added.) The italicized words signify a causal connection. Accordingly, "there is no reasonable likelihood that [the jury] understood there need be no such causal relationship . . . ." (*Id.* at p. 1208.)

Any error would also have been harmless. Here there was no question of causation and defendant did not raise one. He did not dispute that Lo Bue

died at his hands or that he alone inflicted the fatal wounds. His defense involved state of mind, not causation. "The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. [Citations.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather, it is the continuum of sadistic violence that constitutes the torture." (*People v. Proctor* (1992) 4 Cal.4th 499, 530–531 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) The multiple stab wounds both constituted the torture and were the cause of death. "Accordingly we find that even if the trial court's failure to instruct expressly on the causal relationship had been erroneous, it would have been harmless under any standard." (*Cole*, *supra*, 33 Cal.4th at p. 1209.)

### c. *Provocation*

Defendant contends the court "erred in failing to instruct that evidence of provocation could be considered in determining whether any intent to inflict extreme and prolonged pain was deliberate and premeditated." The court did instruct that the jury could consider any provocation "for such bearing as . . . it may have on whether the defendant killed with or without deliberation and premeditation." Defendant argues that the jury would infer from this instruction that it could *not* consider provocation in deciding whether he deliberately and premeditatedly inflicted torture. However, defendant did not ask the court to clarify or amplify this instruction and, accordingly, he may not complain on appeal that it was incomplete. (*Cole*, *supra*, 33 Cal.4th at p. 1211.) Moreover, we find no reasonable likelihood the jury would parse this instruction so finely as to find a negative inference that it could not consider provocation regarding defendant's mental state in inflicting torture. Logically, whatever relevance any provocation had on the mental state with which defendant killed would apply to his mental state regarding infliction of torture. Accordingly, "[t]here is no reasonable likelihood that the jury would have understood these instructions to foreclose them from considering evidence of provocation, if any, in connection with murder by torture." (*Id.* at p. 1212.)

### d. *Unanimity*

Defendant contends the court erred in not instructing the jury that it had to agree unanimously on the theory by which he was guilty of first degree murder. We have repeatedly rejected the claim and continue to do so. (*Cole*, *supra*, 33 Cal.4th at p. 1221, see also *Schad v. Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491].) Further, the jury's finding that the torture-murder special circumstance was true shows that it unanimously agreed on that theory. The only requirement for torture murder not included

in the special circumstance finding is that, for the special circumstance, the acts of torture need not have caused the death. (*Bemore, supra,* 22 Cal.4th at pp. 842–843.) However, as noted above, in this case there was no issue of causation.

### e. *Torture-murder Special Circumstance*

Defendant also contends the court erred in instructing on the torture-murder special circumstance. He argues the instruction was deficient because (1) it did not require a *premeditated* intent to inflict torture; (2) it did not say that the pain inflicted must be in addition to the pain of death; and (3) it confused the jury by saying that defendant must have inflicted pain but the victim's awareness of pain was not required. We rejected each contention in *Cole, supra,* 33 Cal.4th at pages 1226-1228, and continue to do so. (See also *Elliot, supra,* 37 Cal.4th at pp. 476–479.)

### 8) *Validity of Torture-murder Special Circumstance*

Defendant contends the torture-murder special circumstance is vague and overbroad in two ways. First, he claims it "fails to satisfy the nexus that must exist between the alleged torture and the victim's death." We have rejected this claim previously and do so now. (*Bemore, supra,* 22 Cal.4th at p. 843.) Moreover, whatever might be the "outer limits" of the statute in this regard, the act of torture, here the stabbing, was also the cause of death. (*Id.* at pp. 843–844.)

Second, defendant claims that the requirement of "extreme physical pain," in effect at the time of this crime, is too vague. He claims this phrase is no more precise than language such as "especially heinous, atrocious, or cruel," which the United States Supreme Court has found void for vagueness. (*Maynard v. Cartwright* (1988) 486 U.S. 356, 363–364 [100 L.Ed.2d 372, 108 S.Ct. 1853].) We have already effectively rejected this contention. "The narrowing construction absent in *Maynard* is present here. In *People v. Davenport* [(1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861]], this court construed the torture special circumstance as requiring proof that the defendant intended to kill and torture the victim, and inflicted extreme pain upon a living victim. Thus, unlike the vaguely worded aggravating circumstances of 'especially heinous, atrocious, or cruel' (*Maynard, supra,* 486 U.S. 356), the torture special circumstance involved here has been construed narrowly by this court and its constitutionality has been upheld. [Citations.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 454 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Defendant asserts that his current contention is different, because now he claims the word "extreme" is itself vague, a claim not specifically considered in our previous cases. To the extent this is so, this new

challenge is no more convincing than the ones already rejected. The word "extreme" has a "commonsense meaning[] which the jury may be expected to apply." (*People v. Arias* (1996) 13 Cal.4th 92, 189 [51 Cal.Rptr.2d 770, 913 P.2d 980] [noting that, in the context of the torture-murder special circumstance, "we used the word 'extreme' to narrow and clarify the meaning of a special circumstance"].)

### D. *Penalty Phase Issues*

#### 1. *Admission of Prosecution Evidence*

##### a. *Alleged Late Notice of Aggravating Evidence*

The district attorney's original notice of aggravating evidence pursuant to section 190.3 listed defendant's assault on his wife, his arson of Tina Whaley's apartment, and his assault on Rosalind Wathel, but included nothing about his juvenile behavior. On November 19, 1992, the day the defense began presenting its penalty phase evidence, the prosecutor served on defense counsel a petition for disclosure of defendant's juvenile court records in Santa Clara County. On the next court date, November 23, 1992, the court granted the petition over defendant's objection. During cross-examination the same day, defendant admitted he was sent to a boys ranch when he was about 15 years old for assaulting two school janitors and an off-duty police officer. No details of these incidents were mentioned.

On November 30, 1992, after defendant finished testifying, the prosecutor moved to present evidence of defendant's juvenile crimes as either rebuttal or evidence in his case-in-chief. He said he had not given earlier notice because he had only recently become aware of defendant's juvenile record. Defense counsel objected, and stated that he had informed the prosecutor of defendant's juvenile record much earlier. The prosecutor responded that he did not remember. Counsel argued that defendant would be prejudiced by a late presentation of this evidence because he had already testified. The court ruled that the juvenile crimes were not admissible in rebuttal but, after reviewing then recent authority, ruled "that the evidence is admissible on the basis of newly discovered evidence by the prosecution." It permitted the prosecutor to reopen his case-in-chief to present the evidence. Regarding defendant's claim of prejudice, it stated, "The only prejudice the Court perceives is the necessity or the opportunity of the defendant being recalled in some form of surrebuttal or additional evidence taken by way of other witnesses to rebut the evidence that the People are now offering." Defense counsel requested a three-week continuance to meet the new evidence. After further discussion, the court granted a week's continuance, with the understanding that defendant could ask for another week if needed.

At a status conference on December 3, 1992, defendant unsuccessfully renewed his objection. On December 7, 1992, the prosecutor presented the evidence. Defendant then produced three witnesses who testified in mitigation about those incidents.

■ Defendant contends that he received untimely notice and that the court erred in allowing the prosecution to present the evidence. We recently summarized the applicable law. "Section 190.3 provides that, with exceptions not relevant here, 'no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial.' The purpose of this provision 'is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial.' (*People v. Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].) '[W]here the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial has commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. [Citation.] Under such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to meet that evidence. If the prosecutor's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence.' " (*Smith, supra,* 30 Cal.4th at p. 619.)

The prosecutor stated he gave notice of the newly discovered evidence as soon as he knew of it, and the trial court did not find to the contrary. Defendant argues the prosecutor could have, and should have, discovered his juvenile records sooner than he did. "[I]n the absence of prejudice to defendant, the notice, given promptly after the prosecution actually learned of the incident, was adequate." (*Smith, supra,* 30 Cal.4th at p. 620.)

Defendant argues he was prejudiced by the late notice, but fails to substantiate that claim. "In the absence of any indication that the delay in notice had in some fashion affected the manner in which defense counsel handled the prior proceedings, the appropriate remedy for a violation would ordinarily be to grant a continuance as needed to allow defendant to develop a response." (*People v. Carrera* (1989) 49 Cal.3d 291, 334 [261 Cal.Rptr. 348, 777 P.2d 121]; accord, *Rodrigues, supra,* 8 Cal.4th at p. 1153.) Here, defendant was given a one-week continuance, with the possibility of additional time if needed. He presented three witnesses who testified about the incidents. Accordingly, he was fully allowed to develop a response. Defendant claims prejudice because with earlier notice, he "could have told the jury about his involvement in the assaults during direct examination." He claims the "manner in which the assault evidence was presented undoubtedly raised

the question, in the minds of the jurors, of why [he] did not mention these incidents when discussing his life history in direct examination."

Defendant could have testified about the incidents after the prosecution presented the evidence, just as he called other witnesses to address the events. These witnesses largely absolved defendant from wrongdoing. If the jury believed this testimony, it would readily have understood why defendant felt no need to mention the incidents on direct examination.

Because prejudice has not been shown, we need not consider the Attorney General's alternate argument that the evidence of the juvenile incidents would have been admissible on rebuttal. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1071 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

### b. *Other Items of Evidence*

One witness testified that he observed defendant kick a high school custodian four or five times. The prosecutor asked whether defendant "seemed to be enjoying it." The witness responded, "Yeah." Defense counsel objected that the answer was speculation, irrelevant, and inadmissible under Evidence Code section 352. The court overruled the objection.

■ Although defendant contends the court erred in overruling the objection, the court acted within its discretion. (*Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125.) The witness testified that defendant *seemed* to enjoy kicking the custodian. Because the witness was a percipient witness, he spoke from personal observation. He was competent to testify that defendant's behavior and demeanor were consistent with enjoyment. A history of enjoyment in the infliction of pain is relevant at the penalty phase. Defendant also argues the question called for improper opinion evidence. He did not object on that basis at trial, and he may not make that argument on appeal. (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [30 Cal.Rptr.3d 493, 114 P.3d 742].) Such an objection would have failed. ■ Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind.

Defendant objected to the evidence that he set fire to Tina Whaley's apartment, arguing it was a crime against property, not a crime of violence under section 190.3, factor (b). (See *People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) The court found that it involved "the use or attempted use of force or violence to persons," and properly overruled the objection. The arson of Whaley's home could reasonably be considered an attempt to intimidate her by an implied threat of violence. (*People v. Stanley* (1995) 10 Cal.4th 764, 824 [42 Cal.Rptr.2d 543, 897 P.2d 481] [admitting

evidence of car arson].) Moreover, the structure involved was an apartment building. Defendant's conduct put other residents and firefighters in physical danger. (*People v. Lewis* (2001) 26 Cal.4th 334, 392 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

### 2. *Denial of Motion to Disclose Personnel Records of a Police Officer*

After the trial court ruled that the prosecution could present evidence of defendant's assault on an off-duty police officer, counsel sought discovery of the officer's personnel records. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305].) The court conducted an in camera review of the records and denied the motion. At defendant's request we have independently reviewed the records and conclude the trial court properly exercised its discretion in not ordering the records disclosed. (*Samayoa, supra,* 15 Cal.4th at p. 827.)

### 3. *Cross-examination of Defendant*

Defendant contends the court erred in permitting the prosecutor to cross-examine him in various ways.

On direct examination, defendant testified his parents separated when he was 13 or 14 years old. His mother got a job and a new boyfriend, which meant he had more responsibility around the house, becoming "a mother and father to my brother and sisters." He also described an incident when he was 15 years old in which his father "got mad at my mother and started to knock her down to the ground. And I jumped him to stop him from beating on her."

On cross-examination, defendant was asked whether he had also assaulted his mother when he was 15 years old. Defendant denied doing so, but later admitted he had been arrested and referred to the juvenile probation authorities that year because his mother had said he had assaulted her. He again denied committing the assault. Defense counsel did not object to this questioning. Later, over defense counsel's objection on relevance and hearsay grounds, the court permitted the prosecutor to ask defendant whether his mother had reported to the police that he had assaulted her. Defendant said yes, but he also said the charges were "dropped after they did the investigation and found out that is not true." Later still, over defense counsel's objection as irrelevant and beyond the scope of direct examination, the court permitted the prosecutor to ask whether defendant was returned to juvenile hall "because you were a failure and living with your aunt." Defendant said yes. Over a relevance objection, the court permitted the prosecutor to ask defendant whether, when he was 15 years old, he had been reported for

assaulting two janitors and an off-duty police officer at school and sent to a boys ranch. Defendant said he had been but could not remember his age at the time.

Defendant contends this cross-examination about his juvenile record was irrelevant. He notes that neither he nor any other defense witness had mentioned his juvenile record, so it was not proper rebuttal. The contention lacks merit.[18] When defendant testified he had assumed increased responsibilities at home, had become a mother and father to his siblings, and had protected his mother from his father, evidence that he had a juvenile record for acts of violence during that time period became relevant in rebuttal. (*People v. Mickle* (1991) 54 Cal.3d 140, 191–192 [284 Cal.Rptr. 511, 814 P.2d 290].) "[T]he purpose of rebuttal in this context is to present a more balanced picture of the defendant's personality." (*In re Ross* (1995) 10 Cal.4th 184, 208 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (*Ross*).) As did the petitioner in *Ross*, defendant argues that evidence of his juvenile record, "as distinct from the criminal behavior itself, was not admissible. The argument fails because this evidence was to be used as rebuttal. '. . . The rebuttal evidence was not necessarily offered to establish past criminal activity on defendant's part but rather to rebut defendant's claim of good character. [Citation.] The prosecution's evidence was highly probative of defendant's character as a juvenile . . . .' " (*Id.* at p. 209.)

Evidence that defendant's own mother, whom he claimed to have protected from his father, and to have helped so much when she got a job, reported him to the police for assault was highly probative of his character regardless of the truth of the report. Moreover, Bob Creamer, defendant's juvenile probation officer, testified that in 1980, defendant had a sustained juvenile petition. The jury could reasonably infer that this sustained petition related to the assault. Evidence of the sustained petition would both rebut defendant's claim that the charges had been dropped and his testimony about his good character. Under the circumstances, the prosecution was not required to relitigate the allegations of the sustained petition in order to use it in rebuttal. (See *People v. Ray* (1996) 13 Cal.4th 313, 367–369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J.) [rejecting a hearsay objection to use of convictions to show prior criminal activity for sentencing purposes]; *People v. Frierson* (1991) 53 Cal.3d 730, 747 [280 Cal.Rptr. 440, 808 P.2d 1197] [upholding admission of juvenile court adjudication as evidence of criminal activity].)

On direct examination, defendant testified that he had unexpectedly been released from jail at midnight on the night of the Whaley arson. On

---

[18] Also, the claim regarding the first part of the cross-examination is not cognizable because defendant did not object. (*Cooper, supra*, 53 Cal.3d at p. 822.)

cross-examination, the prosecutor established that defendant had "entered into a special program," and signed a "contract" that required him to return to jail. He was supposed to have returned to jail at the time he set the fire. He did not return, but instead went to Texas. In doing so he committed a crime to which he later pled guilty.

Defendant claims the question regarding whether failing to return to jail was a crime was irrelevant, and that the court erroneously overruled his objection below. The testimony was relevant. It directly rebutted the clear implication in defendant's direct examination that he had been unconditionally released from jail at that time. It was proper to "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions . . . ." (*Cooper, supra,* 53 Cal.3d at p. 822.) Moreover, some of his witnesses had testified that, around this time, defendant was a good employee, thus implying that he was a responsible person. This rebuttal evidence was admissible "to present a more balanced picture of the defendant's personality." (*Ross, supra,* 10 Cal.4th at p. 208.)

Defendant also claims the question whether a crime had been committed was improper opinion evidence. He did not object on this basis; the claim is not cognizable. (*Cooper, supra,* 53 Cal.3d at p. 822.) Further, defendant subsequently pleaded guilty to a crime in connection with his absconding. He knew the facts; no opinion was required.

The prosecutor asked defendant whether it was true that he did not "know a single person who could come into this courtroom and speak on your behalf." The court overruled defense counsel's objection on relevance and vagueness grounds. Defendant said that two childhood friends, "the only friends that I ever had," could speak for him. In response to further questioning, he said that no one who knew him well could testify about his character. He agreed that the witnesses who did testify on his behalf did not know him well, and that the persons who knew him best are his parents, Yvonne, Tina Whaley, and Rosalind Wathel. Defendant argues that his "knowledge of whether any persons could testify as a character witness on his behalf was irrelevant." On the contrary, these questions established that defendant's character witnesses did not know him well, and that those who knew him best did not speak on his behalf. The point was relevant to the jury's evaluation of the case in mitigation.

### 4. *Admission of Rebuttal Evidence*

Defendant's juvenile probation officer, Bob Creamer, testified in rebuttal. Defendant challenges portions of that testimony.

Creamer testified that he had frequent contact with defendant's father, usually in "response to a complaint by his father about [defendant's] behavior." The court overruled defendant's objection and motion to strike this testimony. Creamer also testified that during his supervision, defendant never reported that his father was abusing him. On redirect examination, over defendant's foundation objection, Creamer testified that the father's complaints were "very inconsistent with someone who's abusing their child," because a person would not "want to have contact with probation or police or any kind of an investigative organization to complain about things that are irritating you if you're dealing with them by abusing your child." Defense counsel then elicited Creamer's testimony that a child abuser might think he was acting appropriately and not consider his conduct abusive. Creamer also could not say whether defendant's father hit defendant with a belt as defendant had testified.

Defendant's contention that Creamer's testimony about the father's complaints was irrelevant fails. Creamer did not go into detail regarding the complaints, so the testimony was rather innocuous. The mere fact that the jury heard that defendant's father complained about him could hardly have prejudiced defendant. The testimony was relevant to the jury's evaluation of defendant's own claim that his father had abused him. Defendant also contends that "the prosecution did not establish that the juvenile probation officer had sufficient expertise to render an opinion that the conduct of [defendant's] father was inconsistent with his being a child abuser." Assuming defendant's foundation objection was sufficient to preserve this issue (*Champion, supra,* 9 Cal.4th at p. 908, fn. 6), there was no error. The prosecution established that Creamer had substantial expertise. He had been a probation officer for 22 years, part of which he spent investigating child abuse cases. He held a college degree and a teaching credential, as well as a year and a half of graduate study in psychology and physiology.

Creamer also testified over objection that in his opinion, defendant "was not particularly truthful when it wasn't to his advantage," and "impressed [him] as being violent." He was "volatile" and like a "ticking time bomb." The testimony was proper rebuttal. Defendant testified that he had become like a mother and father to his siblings and had protected his mother. Creamer's testimony was relevant to defendant's credibility and to present a more balanced picture of his personality. "The admission of rebuttal evidence is a matter for the sound discretion of the trial court," which was properly exercised here. (*People v. Raley* (1992) 2 Cal.4th 870, 912 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

### 5. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed various acts of misconduct. Again, to complain of prosecutorial misconduct on appeal, defendant must have objected and requested a jury admonition. (*Samayoa, supra,* 15 Cal.4th at p. 841.)

Defendant contends the prosecutor twice referred to evidence outside the record while arguing objections in front of the jury. Defendant presented evidence that his father was arrested for abusing his siblings. During the arresting officer's testimony, the prosecutor objected to a statement by one of defendant's sisters on hearsay grounds. Discussing whether the statement was a spontaneous declaration, the prosecutor argued that the witness was "describing an event that didn't happen that day." A bit later, he stated, "Your honor, . . . you're putting me in a very uncomfortable situation, but I've got a transcript of what took place because the children were deposed at a preliminary examination and they said clearly there was nothing of that type that happened that day. And you keep making—I don't know how you want me to—." Defense counsel objected to the prosecutor "testifying." The prosecutor said, "I've been trying to do it out of the presence of the jury, but you keep forcing me to enunciate it, so I will. Nothing happened of that sort that day, and I have the testimony of the children to that effect. And there's a misunderstanding here." He also said, "There's two distinct events going on here. And he, in answer to the question by counsel, was immediately supplying information relating that something happened on a different date. And that's not a spontaneous statement." At this point, the witness said he had had contact with the family on two occasions, and he was able to distinguish between the two. Later, the prosecutor objected again and a hearing was held outside the presence of the jury. Eventually, the court overruled the prosecutor's hearsay objection, and the testimony continued.

Defendant contends the prosecutor's reference to the preliminary hearing transcript was improper. However, he did not request the jury be admonished to disregard the comments. The issue is not cognizable. An admonition could have cured any harm. The prosecutor never said that the alleged events did not happen, but only that they occurred on different days. The prosecutor's statement that there were two different incidents was not prejudicial. Indeed, the fact that police were called on two separate days would have added weight to defendant's claim that his father was a violent man.

On cross-examination, defendant was asked whether any of his father's siblings "live[d] locally while you were growing up." In response to a

relevance objection, the prosecutor argued "any of these brothers and sisters who live locally would have some knowledge of the extent of the treatment that this defendant received and what it was like for him growing up, and I'm curious if any of these people are going to come in and testify to it." The court permitted the question for that "limited purpose," and defendant testified that some of them did live locally. Defendant contends the prosecutor also referred to evidence outside the record in his response to the relevance objection. Again, his failure to object or request an admonition renders the issue not cognizable. In any event, the prosecutor did not inform the jury of anything. Instead, to show that the question was relevant, he merely argued an inference the jury could draw from an answer that some siblings lived locally. There was no misconduct.

The prosecutor asked defendant whether his father, mother, aunts and uncles were going to testify. Each time, the court sustained a relevance objection. Once, when defendant answered that he did not know, the answer was stricken and the jury directed to disregard it. Defendant claims the prosecutor's questions were misconduct. Beyond sustained objections and a stricken answer, defense counsel sought no further admonition. These questions sought legitimate testimony to support the proper argument that defendant failed to call logical witnesses who could have corroborated some of his testimony. (*People v. Wash* (1993) 6 Cal.4th 215, 262–263 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (*Wash*).) The fact that these witnesses did not testify was relevant. The questions might have been premature and unnecessary. Their nonappearance would eventually be evident, but the questions caused no prejudice.

On cross-examination, defendant insisted he could not remember actually stabbing his victim. He also denied telling William Speed, Tina Whaley, and Rosalind Wathel anything to the contrary and, in response to questions, said they were lying. In a contention similar to his guilt phase argument, defendant contends the "were they lying" questions were improper. The contention lacks merit for the reasons given in the guilt phase discussion. (*Ante*, pt. II.C.5.a.)

One of defendant's high school teachers testified that defendant did not relate much with other students but was "more of a loner." He was "quiet," "cooperative," "pleasant," and "not a problem of any kind." On cross-examination, the prosecutor asked whether she had heard about defendant's assault on the two school janitors. Defendant objected on the basis that it was improper cross-examination and unduly prejudicial. The court sustained the

objection, finding that the question did not impeach the witness's testimony and that its prejudicial effect outweighed its probative value.

Another defense witness, who worked for a church in Houston, testified that defendant was hard working and reliable, "a model employee." On cross-examination, the witness testified that defendant never stole from him or the church even though he had the opportunity to do so. At this point, the prosecutor asked, "But had you heard at the time he was working for you he's committing burglaries on the outside?" Defendant objected. The court effectively sustained the objection, stating it did not "think there's any evidence that this witness has testified to his character." Over objection, the court permitted the prosecutor to ask the witness whether defendant had told him "about a time that he worked . . . on another job drunk and took a swing at his boss." The witness answered, "No."

Defendant unsuccessfully moved for a mistrial based on these questions. The court clarified its view that if a witness limited his testimony to "merely employment, employer, non-personal testimony, I think I will rule under [Evidence Code section] 352 that any other have-you-heard questions as to character is inappropriate and will be excluded." The prosecutor assured the court that he had a good-faith belief that the questions were factually based.

Defendant contends the prosecutor committed misconduct in asking the "have you heard" questions regarding the school assault and the burglaries. The claim is not cognizable because defense counsel did not request an admonition. When he moved for a mistrial, counsel argued that an admonition would have been unavailing. As discussed below, we discern neither misconduct nor prejudice.

Within the sound exercise of its discretion the court could have allowed the questions. Penalty phase rebuttal evidence is proper if it relates directly to a particular character trait defendant offers in his own behalf. (*Ross*, *supra*, 10 Cal.4th at p. 207.) Here, the first of the witnesses testified that defendant was "quiet," "cooperative," "pleasant," and "not a problem of any kind." The second witness testified that defendant was a "model employee" and never stole from him even though he had the opportunity to do so. This testimony made it reasonable for the prosecutor to ask defendant's teacher about defendant's assault on the janitors and his employer about the burglaries. The prosecutor could reasonably have asked these questions in good faith. In general, "have you heard" questions regarding acts or conduct inconsistent with the witness's testimony are appropriate, so long as the

prosecutor has a good faith belief that the acts actually occurred. (*People v. Payton* (1992) 3 Cal.4th 1050, 1066–1067 [13 Cal.Rptr.2d 526, 839 P.2d 1035].) Although bad faith is not a prerequisite to misconduct (*People v. Hill, supra,* 17 Cal.4th at pp. 822–823), the record here establishes no reprehensible conduct of any kind. It is not misconduct to ask a question in good faith even if the court exercises its discretion by sustaining an objection.

We also see no prejudice. Later, the prosecutor did present evidence regarding the assault on the custodians, so asking about it could not itself have caused prejudice. He did not prove any burglary. But the court instructed the jury, "Statements made by the attorneys during the trial are not evidence . . . . If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection. Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it enables you to understand the answer." It also instructed, "Where on cross-examination a witness is asked if he or she has heard of reports of certain conduct of a defendant inconsistent with the traits of good character to which the witness has testified, such questions and the witness's answers thereto may be considered only for the purpose of determining the weight to be given to the opinion of the witness or to his or her testimony as to the good reputation of the defendant. Such questions and answers are not evidence that the reports are true, and you must not assume from them that the defendant did in fact himself or herself consistently conduct himself or herself inconsistently with such traits of character." We assume the jury followed these instructions, and that any prejudice from the brief reference to burglaries was thus avoided. (*Jones, supra,* 15 Cal.4th at p. 168.)

One of defendant's cousins testified about the assault on the off-duty police officer. The prosecutor asked on cross-examination whether the witness had told his mother about the incident. Defense counsel objected as irrelevant. The prosecutor replied that the question went to credibility. Defense counsel asked, "Why is that credibility?" The prosecutor responded, "Because none of this is the truth." Defense counsel objected "to that improper statement and move[d] for assignment of misconduct that the prosecutor [is] stating his personal opinion." The court overruled the original objection, but also "instruct[ed] the jury to disregard all statements of counsel as I've previously done. They're not to be construed in any manner, shape or form. I instruct counsel to refrain from future banter." Outside the jury's presence counsel moved that the prosecutor be cited for contempt and requested a further admonition. The prosecutor responded that he had not expressed a personal

opinion but merely argued the question was relevant to show that the witness was lying. After having the record reread, the court ruled its admonition was sufficient.

It is misconduct for a prosecutor to argue his personal opinion of the evidence if the jury might infer that the opinion is based on information or evidence outside the record. (*Mayfield, supra,* 14 Cal.4th at pp. 781–782.) Given the context in which the comment was made and the court's prompt admonition, it is unlikely that the jury drew any improper conclusion from the prosecutor's comment, let alone the conclusion that the comment reflected information outside the record. It is hardly a revelation to learn that an opposing lawyer considers a witness's testimony untrue. No factual information was provided and the court's prompt admonition cured any potential prejudice.

During penalty phase argument, the prosecutor noted defendant's evidence of abuse as a child but also the lack of expert testimony connecting any such abuse with defendant's adult crimes. He argued that without that testimony, the jury should not rely on the evidence for any purpose but sympathy. He then argued, "Before the defense explains the value of this evidence, as abuse must have, they should first explain to you why they spent a preposterous amount of money—." At this point, defense counsel objected to the argument as an "appeal to passion and impact of whatever the case might cost and—per any side, as improper." The prosecutor responded, "What I'm trying to do is explain how shaky the defense is, because it fails to present a competent expert to explain it and what I'm asking is if they were willing to examine one witness, why didn't they spend the same amount of money to examine their own client." The court overruled the objection and, "[o]nce again, instruct[ed] the jury that statements of counsel are not to be construed as evidence." The prosecutor then continued to argue, "What I was saying to you is that before the defense suggests any additional value to this evidence they should first explain to you why they spent a preposterous amount of money for a psychologist to examine the witness Rosalind Wathel, and yet, did not present the testimony of any expert who examined Erik Chatman. Very simply, why didn't they call a psychologist? Why didn't they call a psychiatrist who had something meaningful to say about Chatman? I would suggest to you that there was no one. There was no one who could corroborate this testimony."

Defendant argues that the prosecutor improperly appealed to the passion of the jurors, denigrated defense counsel, and referred to evidence outside the record. The prosecutor's overall point, which the jury could readily under-

stand, was that the defense had presented no expert evidence connecting the claimed abuse with defendant's crimes and that, had such evidence existed, the defense would have presented it. Comment on the failure to call logical witnesses is legitimate. (*Wash, supra,* 6 Cal.4th at pp. 262–263.) The fact that the defense went to great lengths to examine the witness Wathel strengthened this argument. It is true that neither the jury nor the prosecutor knew whether defense counsel had spent money examining defendant, but the court again admonished the jury that statements of counsel were not evidence, and the point was unimportant. There was no reasonable likelihood the jury gave the comments any improper meaning, and no prejudice occurred. (*Clair, supra,* 2 Cal.4th at p. 663.)

Occasionally and without objection, the prosecutor referred to defendant as a "monster" in his argument. Defendant now contends the references were improper, but because he did not object, the claim is not cognizable. An admonition could have cured any harm. Moreover, if the crime was committed as the prosecutor urged, it was not misconduct for him to label it as monstrous. The comment was permissible. (*People v. McDermott* (2002) 28 Cal.4th 946, 1002–1003 [123 Cal.Rptr.2d 654, 51 P.3d 874], and cases cited.)

 Defendant contends that the prosecutor misstated the law governing the evidence in mitigation, by arguing that the jury could not consider certain evidence as a matter of law. (See *Skipper v. South Carolina* (1986) 476 U.S. 1, 4–8 [90 L.Ed.2d 1, 106 S.Ct. 1669].) The issue is not cognizable. Defendant failed to object and an admonition would have cured any harm. Moreover, we have reviewed the comments defendant cites and find no impropriety. The prosecutor never argued that the jury was not *legally* allowed to consider any mitigating evidence. He only argued that *factually* some of the evidence did not mitigate the crimes. "Although a jury may not be prevented from considering mitigating evidence, the prosecutor may argue that the evidence does not, in fact, support a particular mitigating factor." (*People v. Cleveland* (2004) 32 Cal.4th 704, 764 [11 Cal.Rptr.3d 236, 86 P.3d 302] (*Cleveland*).) The prosecutor here did no more.

### 6. *Instructional Issues*

Defendant contends the jury was misinstructed.

The trial court correctly instructed that before a juror could consider any criminal act in aggravation that "juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts." (See *People v. Robertson* (1982) 33 Cal.3d 21, 53–54 [188 Cal.Rptr. 77,

655 P.2d 279].) It did not define reasonable doubt as part of its penalty instructions, although it had done so at the guilt phase. Defendant contends the court erred in not defining reasonable doubt again. He notes that the court also instructed the jury at the penalty phase to "[d]isregard all other instructions given to you in other phases of this trial" and argues that these instructions left the penalty jury uninformed as to the definition of reasonable doubt.

■ The court should have redefined reasonable doubt at the penalty phase. However, as in *People v. Holt* (1997) 15 Cal.4th 619, 685 [63 Cal.Rptr.2d 782, 937 P.2d 213], "[a]ny possible error arising from the court's failure to [do so] was harmless." Absent any suggestion to the contrary, the jury would likely have assumed the reasonable doubt the court referred to at the penalty phase had the same meaning as the term had during the guilt phase. There is no reasonable likelihood (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385]) the jury would have believed the reasonable doubt analysis it was required to engage in at the penalty phase was somehow different than the reasonable doubt analysis it had already engaged in at the guilt phase. That the court would not have changed the meaning of such an important term without saying so is a "commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190].) Additionally, "the jury did not request a further explanation of the reasonable doubt standard, as it surely would have done had it been confused as to the meaning of reasonable doubt." (*Holt*, at p. 685.)

Defendant relies primarily on *People v. Elguera* (1992) 8 Cal.App.4th 1214 [10 Cal.Rptr.2d 910], which found prejudicial error for failure to instruct on the reasonable doubt standard. The case is distinguishable. The *Elguera* trial court did not mention reasonable doubt at all in its instructions, not even to say the defendant had to be found guilty beyond a reasonable doubt. Although it had discussed reasonable doubt during jury selection, "the instruction was not given to actual jurors, but to prospective jurors who at the time did not know whether they would ultimately serve in the case. As a result, the members of the panel could well have viewed the court's remarks as hypothetical and thus have failed to give the instruction the same focused attention they would have had they been impaneled and sworn." (*Id.* at p. 1222.) Here, by contrast, the court instructed that the jurors had to find beyond a reasonable doubt that defendant had committed another crime before they could consider it in aggravation. Further, the jury had actually applied the reasonable doubt standard at the guilt phase, and found in defendant's favor regarding some allegations.

The trial court refused defendant's request to instruct the jury that it "must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. [¶] In other words, do not consider the same facts more than once in determining the presence of aggravating factors." We rejected the identical claim of error in *People v. Ayala* (2000) 24 Cal.4th 243, 288–290 [99 Cal.Rptr.2d 532, 6 P.3d 193]. In the absence of misleading argument, not present here, there is no "reasonable likelihood that the jury applied the instructions given it in a legally improper manner." (*Id.* at p. 290.)

Defendant challenges the court's refusal to instruct that the jury could consider in mitigation *any* mental or emotional disturbance he has suffered. He argues that because the court instructed the jury in terms of section 190.3, factor (d), which requires the jury to consider whether the defendant "was under the influence of extreme mental or emotional disturbance" when he committed the offense, the jury was precluded from considering a disturbance that was less than extreme. The argument fails. The court also told the jury to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or background that the defendant offers as a basis for a sentence less than death whether or not related to the offense for which he is on trial." This "catchall" instruction allowed consideration of any nonextreme mental or emotional disturbance. (*Jones, supra,* 15 Cal.4th at p. 190.)

Defendant contends that CALJIC No. 8.88, the standard penalty phase concluding instruction, is constitutionally flawed in various respects. We have repeatedly upheld this instruction and continue to do so. Use of the words "so substantial" does not render the instruction impermissibly vague. (*People v. Crew* (2003) 31 Cal.4th 822, 858 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Use of the term "warrants" does not render the instruction overbroad and permissive. (*Ibid.*) The instruction need not state that the prosecution has the burden of proof with respect to the appropriate punishment. (*Ibid.*) The jury need not make written findings or achieve unanimity as to specific aggravating circumstances. Except as to other crimes, it need not find beyond a reasonable doubt that aggravating circumstances are true. (*People v. Young* (2005) 34 Cal.4th 1149, 1233 [24 Cal.Rptr.3d 112, 105 P.3d 487] (*Young*).) Nor need the jury find beyond a reasonable doubt that aggravating circumstances outweigh mitigating ones, or that the death penalty is appropriate. (*Ibid.*) The instruction need not relate that a sentence of life imprisonment without the possibility of parole means the defendant will never be paroled. (*Smith, supra,* 30 Cal.4th at pp. 635–636.) The instruction does not improperly omit that the jury must return a verdict of life imprisonment without the possibility of parole if it finds that the mitigating factors outweigh the aggravating factors,

or that it may return a sentence of life imprisonment without the possibility of parole even in the complete absence of any mitigating evidence. (*People v. Anderson* (2001) 25 Cal.4th 543, 600, fn. 20 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1231 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) The jury may constitutionally consider unadjudicated criminal activity in aggravation. (*Smith, supra,* 30 Cal.4th at p. 642.) Contrary to defendant's contention, *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not affect these conclusions. (*Smith, supra,* 30 Cal.4th at p. 642.)

### E. *Cumulative Error*

Defendant's contention, that the cumulative effect of the asserted errors was prejudicial, fails. There was no significant error to accumulate. Defendant received a fair trial.

### F. *Constitutionality of California's Death Penalty Law*

Defendant challenges California's death penalty law on grounds we have repeatedly rejected. Given the catchall factor (k) of section 190.3, the wording of some of the other factors listed in that section does not prevent full consideration of mitigation. (*People v. Maury* (2003) 30 Cal.4th 342, 439 [133 Cal.Rptr.2d 561, 68 P.3d 1].) The statute does not unconstitutionally fail to narrow the class of persons eligible for the death penalty. (*Young, supra,* 34 Cal.4th at p. 1233.) Prosecutorial discretion in charging special circumstances or seeking the death penalty is not unconstitutional. (*Ibid.*) Intercase proportionality review is not required. (*Cleveland, supra,* 32 Cal.4th at p. 768.)

"We do undertake intracase proportionality review on request to determine whether the penalty is disproportionate to the defendant's personal culpability . . . ." (*Cleveland, supra,* 32 Cal.4th at p. 768.) Defendant does not specifically request intracase proportionality review, but the death penalty he faces is not disproportionate to his conduct. Defendant acted alone when he stabbed his victim to death. The jury found, on proper and substantial evidence, that the killing involved torture. Defendant committed other crimes of violence, both before and after he murdered Rosellina Lo Bue. The death sentence does not shock the conscience. (*Id.* at p. 769, fn. 11.)

## III. Disposition

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Gemello, J.,[*] concurred.

Appellant's petition for a rehearing was denied July 19, 2006.

---

[*]Associate Justice, Court of Appeal, First Appellate District, Division 5, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.